# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### April 22, 2010 Session

## TERESA LYNN STANFIELD, ET AL. v. JOHN NEBLETT, JR., M.D., ET AL.

**Direct Appeal from the Circuit Court for Madison County**
**No. C06-273     Roger A. Page, Judge**

---

**No. W2009-01891-COA-R3-CV - Filed June 4, 2010**

---

This is a medical malpractice case. The jury returned a verdict, finding that the Appellee/Doctor deviated from the standard of care, but that his deviation was not the legal cause of the injury. Appellant contends that the trial court erred in denying her motion for a directed verdict, erred in ruling on her objections to Appellee's experts and the impeachment of her experts, that she was prejudiced by the language used on the verdict form, and that the trial court abused its discretion in allowing Appellee to make a powerpoint presentation during opening statements and closing arguments. Finding no error, we affirm.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Michael L. Weinman, Jackson, Tennessee, and Thomas L. Long, Collierville, Tennessee, for the appellant, Teresa Lynn Stanfield, Individually, and on behalf of the heirs at law of Trista Jane Greene, Deceased.

Dixie W. Cooper, Chris J. Tardio, Nashville, Tennessee, for the appellees, John Neblett, Jr., M.D., and West Tennessee Neurosurgical Clinic. P.C.

**OPINION**

On August 8, 2006, Appellant, Teresa Lynn Stanfield ("Ms. Stanfield") filed this action individually and on behalf of the heirs at law of her daughter, Trista Jane Greene ("Ms. Greene"). Ms. Stanfield named Appellees, John Neblett, M.D. ("Dr. Neblett") and

West Tennessee Neurosurgical Clinic, P.C. as defendants.[1]  Ms. Greene sustained head injuries during an ATV accident, which occurred on August 29, 2005.  Following the accident, she was taken to Jackson Madison County Hospital (the "Hospital").  After being treated and evaluated in the emergency room, Ms. Greene was admitted to the neurological intensive care unit at the Hospital. On August 30, 2005, she was transferred to the intermediate neurosurgical unit on the orders of Dr. Neblett and another doctor that was also treating Ms. Greene.  At some point during her stay at the hospital, Ms. Greene's neurological status deteriorated.  It is disputed when the deterioration began.  Dr. Neblett asserts that he was not notified of the deterioration in Ms. Greene's status until approximately 10:50 p.m on August 30, 2005.  Ms. Greene died  on August 31, 2005, as a result of her neurological injuries.  Ms. Stanfield asserted in her complaint that Dr. Neblett is guilty of medical negligence for failing to properly assess and treat her daughter, for transferring her daughter out of the intensive care unit, and for failing to timely diagnose and treat her daughter. Also in her complaint, Ms. Stanfield asserted that the nursing staff at the hospital "failed to appreciate [her daughter's] changing neurological status," which changes required immediate attention, and "failed to take the appropriate action....and failed to immediately notify Dr. Neblett...."

Dr. Neblett and West Tennessee Neurological Clinic, P.C. filed an answer on January 8, 2007.  In his answer, Dr. Neblett denied that he was guilty of medical negligence, stating that he complied with the standard of care.  In defense of the claims lodged against him, Dr. Neblett averred the comparative fault of the hospital and nursing staff.[2]

A jury trial began on February 23, 2009.  The trial concluded on March 3, 2009.  That same day, the jury returned a verdict in favor of Dr. Neblett.  According to the verdict form, the jury found that Dr. Neblett did deviate from the standard of care, but that his deviation was not the legal cause of Ms. Greene's death.  The trial court entered a judgment reflecting this decision on March 24, 2009.

On April 22, 2009, Ms. Stanfield filed a Motion for New Trial. In her motion, Ms. Stanfield raised ten issues which she contended entitled her to a new trial.  The trial court entered an order on September 4, 2009, denying the motion.

---

[1]Jackson Madison County General Hospital District, d/b/a Jackson Madison County General Hospital was also named as a defendant. Subsequently Ms. Stanfield voluntarily dismissed the claim against the hospital.

[2]Dr. Neblett also asserted the defense of the comparative fault of Ms. Greene or the person responsible for the ATV accident.  Upon the motion of Ms. Stanfield, this defense was struck by the trial court.  This is not an issue on appeal.

Ms. Stanfield filed a notice of appeal on September 11, 2009. She raises seven issues for our review, all of which were also raised in her Motion for New Trial as required by Tenn. R. App. P. 3(e). We restate them as follows:

1. Whether the trial court erred in allowing Dr. Neblett's counsel to show portions of what was purported to be excerpts from the trial transcript to the jury during closing arguments?
2. Whether the trial court erred by denying Ms. Stanfield's Motion for a directed verdict as to Dr. Neblett's comparative fault claims?
3. Whether the trial court erred by allowing Dr. Neblett's experts to testify as to opinions not identified in their Rule 26 disclosures?
4. Whether the language regarding causation on the verdict form was misleading and, therefore, caused the jury to misunderstand the required showing?
5. Whether the trial court erred in allowing Dr. Neblett to impeach Ms. Stanfield's experts through medical treatises?
6. Whether Dr. Neblett's experts satisfied the locality rule and were properly qualified to render opinions?
7. Whether the trial court erred in allowing Dr. Neblett's counsel to make a power point presentation, which included exhibiting documents that had not yet been admitted into evidence, during opening arguments?

## I. Directed Verdict

Ms. Stanfield contends that the trial court erred in denying her motion for directed verdict on Dr. Neblett's comparative fault defense. A trial court's decision to grant a motion for directed verdict involves a question of law. *Underwood v. HCA Health Servs. of Tennessee*, Inc., 892 S.W.2d 423, 425 (Tenn. Ct. App. 1994). On appeal, we apply the same standard used by the trial court when ruling on the motion initially. *United Brake Sys., Inc. v. Am. Envtl. Prot., Inc*., 963 S.W.2d 749, 754 (Tenn. Ct. App. 1997). Accordingly, we do not weigh the evidence or evaluate the credibility of witnesses. *Id.* (citing *Underwood*, 892 S.W.2d at 425). Rather, we consider all of the evidence, taking the strongest legitimate view of it in the non-moving party's favor. *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). The court should grant the motion, "only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence." *Id.*

In his answer, Dr. Neblett asserted the defense of the comparative fault of the hospital and the nursing staff. Accordingly, Dr. Neblett bears the burden of proving comparative fault. *Banks v. Elks Club Pride of Tenn. 1102*, 301 S.W.3d 214, 224 (Tenn. 2010).

After reviewing the record, we find that the trial court did not err in denying Ms. Stanfield's motion for a directed verdict. There is ample evidence in the record upon which a jury could find that the nursing staff was at fault. On direct examination, as Ms. Stanfield's witness, Dr. Neblett testified that, based on the nurse's notes in Ms. Greene's medical records around 7:00 p.m. on August 30, 2005, the nursing staff should have called him to inform him of Ms. Greene's status. Instead, according to Dr. Neblett, he was not contacted until approximately 10:50 p.m. that day. He testified that the standard of care was to rely on the nurses to call him. Dr. Marvin Rozear, one of Ms. Stanfield's experts, testified that based upon the Glasgow Coma score given by the nurse at 1:00 p.m. on August 30, 2005, the nurse's notes describing Ms. Greene's condition were inaccurate. Moreover, Dr. Rozear testified that he expects his nurses to contact him upon a change in the mental status of a patient, and that, had the nurses contacted Dr. Neblett and had he responded appropriately, the outcome would have differed. Dr. Isabelle Richmond, also one of Ms. Stanfield's experts, testified that the August 30, 2005, 1:00 p.m. nurse's notes and the Gaslgow Coma Score given by the nurse at 1:00 p.m. are inconsistent, implying that the nurse erred. Dr. Richmond also testified that the nurse did not notify Dr. Neblett at 4:15 p.m. when she documented that Ms. Green was holding her head and groaning, and that, had Dr. Neblett been notified and had he come to the hospital, Ms. Green would have survived. Dr. Richmond testified that she was familiar with nursing protocols and when a doctor should be notified. Dr. Arthur Daus, another expert for Ms. Stanfield, also testified that it was reasonable for Dr. Neblett to expect a call from the nurses when Ms. Greene's status changed. Dr. Owen Samuels, an expert for Dr. Neblett, testified that the standard of care required the nurses to communicate any changes to Dr. Neblett and that they failed to contact him at 7:00 p.m. on August 30, 2005, after documenting dramatic changes. Finally, the nurse that was on duty the night of August 30, 2005, and who actually treated Ms. Greene, testified that she knew that the standard of care required her to call Dr. Neblett upon a change in the mental status of a patient. She testified that she was not entirely sure that Ms. Greene had undergone a significant change, but instead of contacting Dr. Neblett as she knew she should, she consulted with other nurses. Finding sufficient evidence in the record, we affirm the trial court's denial of Ms. Stanfield's motion for a directed verdict.

## II. Experts

Decisions regarding the admissibility of evidence rest within the sound discretion of the trial court. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). Accordingly, we review the trial court's decisions under an abuse of discretion standard. *State Dep't of Transp. v. Veglio*, 786 S.W.2d 944, 948 (Tenn. Ct. App. 1989). The abuse of discretion standard requires us to consider "(1) whether the decision has a sufficient evidentiary foundation, (2) whether the trial court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of

acceptable alternatives." ***State ex rel. Vaughn v. Kaatrude***, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). "While we will set aside a discretionary decision if it rests on an inadequate evidentiary foundation or if it is contrary to the governing law, we will not substitute our judgment for that of the trial court merely because we might have chosen another alternative." ***Id.*** If this Court finds error, we will only set aside the final judgement upon a finding that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

*A. Dr. Neblett's Experts*

i. Rule 26 Disclosures

Ms. Stanfield submits on appeal that the trial court erred in allowing Dr. Neblett's experts to testify regarding opinions not provided in their Rule 26 disclosures.[3] Pursuant to Rule 37.03 of the Tennessee Rules of Civil Procedure, the trial court may exclude an expert's testimony when the opposing party asserts that the expert did not disclose an opinion in his or her Rule 26 expert disclosures. "Exclusion is proper only if the disclosures failed to give the opposing side reasonable notice of the opinions such that, without exclusion, there would be unfair surprise or trial by ambush." ***Watkins v. Affiliated Internists, P.C.,*** No. M2008-01205-COA-R3-CV, 2009 WL 5173716, *20 (Tenn. Ct. App. Dec. 29, 2009)(citations omitted). The decision to exclude an experts testimony under Rule 37.03 rests within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. ***Id.***

According to Ms. Stanfield, the trial court erred in allowing Dr. Neblett's experts to testify about the actions of the nurses, specifically their failure to notify Dr. Neblett as these opinions were not previously disclosed. Also, Ms. Stanfield argues that the trial court erred

---

[3]Tennessee Rule of Civil Procedure 26.02 provides in pertinent part:

> 4) Trial Preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
>
> (A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

in allowing Dr. Neblett's expert, Dr. Owen Samuels, to testify as to a newly formed opinion on Ms. Greene's transfer summary. Prior to trial, Ms. Stanfield filed a motion *in limine* requesting that the trial court limit Dr. Neblett's experts' testimonies to only those opinions provided in the Rule 26 disclosures. By order entered May 14, 2009, the trial court granted the motion in that the "experts [would] be required by the [trial] court to testify consistent with their Rule 26 disclosures." At the pretrial hearing, the trial court specifically stated that the experts would not be required to testify from their report. However, the trial court held that the experts would not be allowed to offer new opinions, but could respond to criticisms made by Ms. Stanfield's experts.

Ms. Stanfield, in her brief, only specifically objects to the testimony of Dr. Owen Samuels. After reviewing Dr. Neblett's expert disclosures, this Court finds that the testimony of the experts as to the actions of the nursing staff was adequately disclosed. The supplemental disclosure for Dr. Samuels specifically states that the nurses were required to notify Dr. Neblett when Ms. Greene's Glasgow Coma Score dropped from a score of thirteen to a score of nine. Also, two other disclosed experts indicated in their Rule 26 disclosures that they had criticisms of the failure of the nursing staff to notify Dr. Neblett. Accordingly, any testimony regarding the actions of the nursing staff was not outside the scope of Dr. Neblett's Rule 26 disclosures.

Further, after reviewing the record, this Court finds that the testimony of Dr. Neblett's experts, regarding the actions of the nurses and the expectations Dr. Neblett should have of the nurses, and the testimony regarding the transfer summary were responses to criticisms made by Ms. Stanfield's experts. While not required, Dr. Neblett's Rule 26 disclosure specifically states that "[t]he experts disclosed above may be called upon to respond to specific criticisms levied by the experts disclosed by [Ms. Stanfield] or to specific testimony elicited from other witnesses at trial." On direct examination of Dr. Neblett, Ms. Stanfield made an issue of the nurses' duty, without specific orders, to contact Dr. Neblett upon a change in the mental status of a patient. Further, with regard to the action of the nurses, Ms. Stanfield's expert, Dr. Isabella Richmond, in response to a question asked by Ms. Stanfield's counsel, testified that the nurse's 1:00 p.m. notes were inconsistent and indicated error. Ms. Stanfield's expert, Dr. Arthur Daus, also indicated on direct examination that the nurses may have erred in their assessment of Ms. Greene at 1:00 p.m. As to the transfer summary, Ms. Stanfield's expert, Dr. Marvin Rozear, testified that, upon being notified of Ms. Greene's transfer from the intensive care unit to the floor, Dr. Neblett should have asked about the condition of the patient. Dr. Rozear testified that, based upon the notes regarding Ms. Greene's status in the transfer summary, Dr. Neblett should not have allowed her to be transferred. Dr. Rozear based his belief that Dr. Neblett was notified of the transfer on the notations contained in the transfer summary.

The rules of discovery exist, in part, to prevent "trial by ambush." ***Austin v. City of Memphis***, 684 S.W.2d 624, 632 (Tenn. Ct. App. 1984). Expert testimony should only be excluded when there would be "unfair surprise or trial by ambush." ***Watkins v. Affiliated Internists, P.C.,*** 2009 WL 5173716 at*20. Based on Ms. Stanfield's examination of her own experts, it is obvious to this Court that she was aware that the actions by the nurses, as well as the transfer summary, were an issue. Consequently, we do not find that the trial court abused its discretion in allowing Dr. Neblett's experts to testify on these issues.

### ii.Qualifications

At trial, there were numerous objections to the qualifications of each party's experts. Ms. Stanfield contends that Dr. Neblett's experts were not properly qualified to testify as experts. The determination of the admissibility, qualifications, and competency of expert testimony lies within the sound discretion of the trial court. ***Taylor ex rel. Gneiwek v. Jackson-Madison County Gen. Hosp. Dist.,*** 231 S.W.3d 361, 365 (Tenn. Ct. App. 2006). Accordingly, we review the admissibility of expert testimony under an abuse of discretion standard. ***Wilson v. Patterson***, 73 S.W.3d 95, 102 (Tenn. Ct. App. 2001).

Ms. Stanfield first submits that neither Dr. Manuel Weiss, Dr. Richard Miller, nor Dr. Owen Samuels qualified as experts under the locality requirement. The locality requirement is found in Tennessee Code Annotated § 29-26-115(b). Based on the locality requirement, to testify as an expert in a medical malpractice case, the expert must (1) have been licensed to practice in Tennessee or a contiguous bordering state, a profession which would make the testimony relevant and (2) have actually practiced the profession in Tennessee or a contiguous bordering state in the year preceding the date of the alleged injury. Tenn. Code. Ann. § 29-26-115(b). After reviewing the record, we find that all of Dr. Neblett's experts met the locality requirement. Dr. Samuels was a licensed and practicing physician in Georgia in 2005 and at the time of trial, and was board certified in neurology. Dr. Miller is a surgeon who specializes in trauma. He was the medical director of the trauma unit at Vanderbilt University Medical Center in Tennessee in 2005 and at the time of trial. He was certified under Advanced Trauma Life Support ("ATLS") and was licensed in Tennessee in 2005 and at the time of the trial. Dr. Weiss is a neurosurgeon who was licensed and practicing in Tennessee at the time of trial and in 2005. Consequently, this Court finds that all of Dr. Neblett's experts met the statutory locality requirement.

From Ms. Stanfield's brief it appears that she may be confusing the requirement that the expert be sufficiently familiar with the standard of care required of Dr. Neblett with the locality requirement. The locality requirement and the requirement that the expert be familiar with the standard of care are two separate requirements. Tennessee Code Annotated § 29-26-115(a) requires that the expert be familiar with the standard of care required of the profession

and speciality of the defendant in the community in which the defendant practiced or a similar community.

To testify as a medical expert, "[e]xpert witnesses may not simply assert their familiarity with the standard of professional care in the defendant's community without indicating the basis for their familiarity." *Williams v. Baptist Memorial Hosp.,* 193 S.W.3d 545, 553 (Tenn. 2006)(citations omitted)*.* The burden of demonstrating that the expert is qualified is on the party proffering the testimony. *Carpenter v. Keppler*, 205 S.W.3d 474, 783 (Tenn. Ct App. 2006). "The expert must present facts demonstrating how he or she has knowledge of the applicable standard of professional care either in the community in which the defendant physician practices or in a similar community." *Kenyon v. Handal*, 122 S.W.3d 743, 762 (Tenn. Ct. App. 2003). This Court has previously rejected a national standard of care and even a state-wide standard of care. *Id.* (citations omitted). An expert need not be able to recite all of the medical statistics of a community. *Ledford v. Moskovitz*, 742 S.W.2d 645, 648 (Tenn. Ct. App. 1987). However, "a complete lack of knowledge concerning a community's medical resources would be contrary to knowledge of the required standard of care. *Mabon v. Jackson-Madison County General Hospital*, 968 S.W.2d 826, 831 (Tenn. Ct. App. 1997). "[A] reasonable basis for an experts knowledge of the medical community in question could consist of information such as the size, location and presence of teaching hospitals in the community. *Carpenter*, 205 S.W.3d at 478 (citing *Sandlin v. University Medical Center*, No. M2001-00679-COA-R3-CV, 2002 WL 167716, at *6 (Tenn. Ct. App. July 25, 2002)). We review the trial court's decision on whether the expert presented sufficient facts to demonstrate that he or she is familiar with the standard of care of the community in which the defendant practices or a similar community under an abuse of discretion standard. *Id.* at 759. We will not overturn the trial court's decision merely because reasonable minds could reach a different conclusion. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

Our Supreme Court has had several opportunities to review and discuss a trial court's decision on whether an expert has knowledge of the standard of care in the defendant's community or a similar community. In *Stovall v. Clarke*, 113 S.W.3d 715 (Tenn. 2003), our Supreme Court affirmed a trial court's determination that the expert had knowledge of the appropriate standard of care. In affirming the trial court, the *Stovall* court noted that unlike other cases the expert at issue did not rely on a national standard or equate the state standard to a national one, nor did the expert simply make a vague conclusory statement that he had knowledge of the appropriate standard of care. *Id.* at 723. Instead, as discussed in *Stovall*, the expert testified that he had never practiced in Tennessee, but had reviewed twenty medical charts from Tennessee, testified in three other cases in Tennessee and had reviewed statistical information about the medical community, including the number of medical specialists and resources available. *Id.* The *Stovall* Court distinguished its case from

*Robinson v. Le Corps*, 83 S.W.3d 718 (Tenn. 2002), in which the court held that the expert did not provide sufficient support for his assertion that he was familiar with the appropriate standard of care. *Id.* In *Robinson*, the court noted that expert merely testified that the standard of care "would be expected" to be the same as the national standard of care. *Robinson*, 83 S.W.3d at 724. Moreover, the Robinson expert provided no basis whatsoever for assertion of knowledge of the standard of care or why he thought Nashville and his community were similar. *Id.*

This Court has also reviewed a trial court's decision on whether an expert has knowledge of the standard of care in the defendant's community or a similar community on numerous occasions. We affirmed the trial court's decision to exclude an expert's testimony in *Ayers v. Rutherford Hosp. Inc,* 689 S.W.2d 155 (Tenn. Ct. App. 1984). In *Ayers*, the expert at issue testified to a national standard of care. *Id.* at 162-63. Further, the expert did not know where Murfreesboro- the defendant's community- was located, whether it was a big or small town, any physicians in Murfreesboro, where the defendants trained or the size of the hospital at issue. *Id.* at 163. In *Mabon*, we again found that an expert was not familiar with the appropriate standard of care and therefore could not testify. *Mabon,* 968 S.W.2d at 831. The *Mabon* expert indicated in his testimony that he believed there was a national standard of care. More importantly, the expert did not know the population of the city at issue, the number of hospitals in the city, whether there were any colleges, universities or medical schools in the city, how many specialities were represented in the city, how many doctors where in the area, and that he had not treated anyone from the city or reviewed any medical records from the city. *Id.* In *Kenyon*, we again found that the expert did not have the required knowledge of an appropriate standard of care. *Kenyon,* 122 S.W.3d at 762. The expert stated that the state standard of care was the same as his state's standard, indicating that he relied on a statewide standard of care. *Id.* Also, the expert provided no basis for his assertion that he was familiar with the standard of care or his assertion that the communities were similar. *Id.*

We have reviewed the testimony of each of Dr. Neblett's experts. After our review, we find that, based on the case law of this State, Ms. Stanfield has not demonstrated that the trial court abused its discretion in finding that Dr. Neblett's experts had sufficient knowledge of the standard of care of Dr. Neblett's community or a similar community.

Dr. Samuels is a physician licensed in Georgia, board certified in neurology, and at the time of trial, he was serving as the director of neurological care at Emory University School of Medicine. Dr. Samuels admitted that he does not treat patients in Tennessee, but had spoken at Vanderbilt Medical School several times. Dr. Samuels stated that he knew the hospital at issue had about six hundred beds, making it a large hospital, and that it had multiple sub-specialities, an active neurosurgery service, five or six neurosurgeons, and a

large catchment[4] area of five hundred thousand people. He testified that this was similar to Emory, the hospital he practiced at. He explained that the hospital in Jackson has a full scope trauma service. According to Dr. Samuels, the level of trauma service and the intensive care unit for head trauma at the Jackson hospital is similar to Emory. Dr. Samuels carefully explained the equipment and services available at the hospital in question. He explained that all of the medical specialities needed for the treatment of an injury like Ms. Greene's are available in Jackson. He further explained that this is similar to Emory. Dr. Samuels testified that the hospital had a neurological intensive care unit and a neurology floor, active operating rooms capable of doing whatever needed to be done, and a "full gamut" of radiological services. He testified that these factors make the hospital similar to Emory. Dr. Samuels expressed that he understood the nursing flow sheets, methods of monitoring and treatment modalities used at the hospital in question. According to Dr. Samuels, the nursing flow sheets used at the hospital are similar to the ones he uses at Emory. He testified that the monitoring of Ms. Greene, as evident from the medical records, is similar to the method of monitoring provided at Emory. Dr. Samuels testified that there were two hospitals in Jackson, with about three hundred doctors. He further testified that the hospital at issue and Emory are similar as far as the treatment of closed head injuries like Ms. Greene's. On cross examination he admitted that Jackson and Atlanta are not similar communities. However, on re-direct examination, Dr. Samuels testified that the medical communities are similar.

As in *Stovall*, Dr. Samuels provided sufficient support for his assertion that he was familiar with the standard of care of a similar medical community. He did not simply make a bare assertion without providing the court with support for his assertion. He had detailed knowledge of the hospitals and medical facilities in Jackson, making him aware of the resources available in the area. We recognize that merely speaking at a medical school in the same state does not alone indicate that an expert is familiar with the standard of care of the defendant's medical community. However, Dr. Samuels testified that he was familiar with the hospital at issue from reading about the medical community. He reviewed Ms. Greene's medical records and testified that they were similar to those used in his hospital, indicating to this Court that he had a sufficient understanding and experience with the standard of care expected in Jackson. We recognize that Ms. Stanfield was not provided the opportunity to voir dire Dr. Samuels. However, Ms. Stanfield was allowed to fully cross examine Dr. Samuels. Other than a single question comparing Jackson and Atlanta, Ms. Stanfield did not attempt to question Dr. Samuels on his knowledge of the standard of care. It is not within the province of this Court to assume facts about the hospitals or communities discussed when such does not appear within the record. *State Dept. Of Children Servs. v. D.W.J.,* No. E2004-0286-COA-R3-PT, 2005 WL 1528367, at *4 (June 29, 2005). Based upon the record in this case, we find that the trial court did not abuse its discretion in holding

---

[4]Catchment refers to the area which the hospital being described treats the medical issues that arise.

that Dr. Samuels provided sufficient facts to support his assertion that he was familiar with the standard of care in a community similar to Dr. Neblett's.

Dr. Miller testified that he was the medical director of the trauma unit at Vanderbilt University Medical Center in Nashville.[5] He testified that he was certified to teach the ATLS course in his region. Dr. Miller testified that he was familiar with the medical community in Jackson and the standard of care for a patient with an injury like Ms. Greene's at the Jackson hospital in 2005. His familiarity with Jackson comes in part because he treats patients referred from that area and also because he is actively involved in the trauma system for the State. He testified that the City of Jackson had a population of about sixty thousand and the area had a population of about one-hundred-and-forty thousand. He testified that he often interacts with physicians in Jackson when discussing whether to transfer a patient to Nashville. He testified that there are two hospitals in Jackson and that the hospital at issue has approximately six hundred beds. Dr. Miller testified that the hospital has a neurological intensive care unit and also a step-down unit on the same floor. He testified that he was familiar with the standard of care for the treatment of a patient like Ms. Green at Vanderbilt, and that the standard of care was similar to the standard of care in Jackson. He then directly testified that he was familiar with the standard of care in Jackson.

Dr. Miller also provided sufficient support for his assertion that he was familiar with the standard of care in Jackson and similar communities. He did not simply make a bare assertion, but instead provided the trial court with an adequate basis for his assertion that he was familiar with the standard of care in Jackson. He testified that he is involved in the trauma system throughout the State, which includes working with patients and doctors in Jackson. He teaches the ATLS course in the region, which includes Jackson, demonstrating his knowledge of the standard of care expected of doctors treating trauma patients such as Ms. Greene in Jackson. He has also treated patients referred from Jackson, indicating his knowledge of what to expect from doctors in that area. Further, unlike the experts in *Ayers* and *Mabon*, he had detailed knowledge of Jackson and the medical resources available in Jackson, indicating knowledge of the level of care which could be expected in that community. Further, Ms. Stanfield did not cross examine Dr. Miller on his assertion that he was familiar with the standard of care in Jackson. Based upon the record in this case, we find that the trial court did not abuse its discretion holding that Dr. Miller provided sufficient facts to support his assertion that he was familiar with the standard of care in Jackson.

Dr. Weiss testified that he was a neurosurgeon currently practicing at several hospitals in Nashville, Tennessee. Dr Weiss testified that he was familiar with the standard of care in Jackson. He said that he had treated patients referred from communities like Jackson. He

_____

[5]Dr. Miller's testimony was presented to the jury through a video-taped deposition.

expressed knowledge of numerous details about the hospital at issue in Jackson; specifically, that it had six or seven hundred beds, had a catchment of about five hundred thousand patients, had six practicing neurosurgeons, had both a neurological floor and intensive care unit, had about twenty operating rooms, and CT scans were readily available. Dr. Weiss also testified about the treatment modalities and nursing flow sheets used by the hospital in Jackson. He further testified that the hospital in Jackson practiced differential diagnosis. He testified that he knew Jackson had a population of about sixty or seventy thousand people and that there were two hospitals in Jackson. Dr. Weiss testified that he was familiar with the standard of care that would apply to a neurosurgeon like Dr. Neblett in the care of a patient like Ms. Greene in 2005.

Finally, we find that Dr. Weiss also provided sufficient support for his assertion that he was familiar with the standard of care in Jackson. Like the other experts, he also did not simply make a bare assertion of familiarity without providing the court with a basis for his assertion. Like Dr. Miller, Dr. Weiss has treated patients referred from Jackson, indicating his knowledge of the standard of care to be expected from physicians in Jackson. He also demonstrated a detailed knowledge of Jackson and the medical facilities and resources available in that community, which would affect the standard of care to be expected. He also testified about the resources available, the treatment modalities and method of diagnosis, indicating an understanding and experience with the level of care provided in Jackson. Further, Ms. Stanfield did not cross examine Dr. Weiss on his assertion that he was familiar with the standard of care in Jackson. Based upon the record in this case, we find that the trial court did not abuse its discretion in holding that Dr. Weiss provided sufficient facts to support his assertion that he was familiar with the standard of care in Jackson.

Ms. Stanfield also contends that neither Dr. Miller nor Dr. Samuels were qualified to testify about the standard of care of a neurosurgeon. Tennessee Code Annotated §29-26-115(b) requires that the expert be licensed in a profession or specialty which makes the testimony relevant. There is no requirement that the expert be licensed in the same profession or speciality as the defendant. *See* ***Bravo v. Sumner Reg'l Health Sys., Inc.***, 148 S.W.3d 357, 365 (Tenn. Ct. App. 2003)(citing Tenn. Code. Ann. § 29-26-115(b); and ***Ledford v. Moskowitz***, 742 S.W.2d 645, 647 (Tenn. Ct. App. 1987)).

At the time of trial, Dr. Samuels was board certified in neurology, and was serving as the director of neurological care at Emory University School of Medicine. He testified that, as part of his position, he trains neurologists and neurosurgeons in the care of acute brain injuries. Also, as part of his position, he is in charge of the intensive care unit at Emory, overseeing the nursing staff and other doctors. He testified that he treats patients in the area of neurocritical care, which includes neurology and neurosurgery. Clearly, Dr. Samuels testimony is relevant to Dr. Neblett's care of Ms. Greene and Dr. Neblett's expectations of

the nursing staff.

Dr. Miller, at the time of trial, was the medical director of the trauma unit at Vanderbilt University Medical Center. He was board certified in both general surgery and surgical critical care. He teaches the ATLS course dealing with the treatment of critical patients. In his practice, he is responsible with the overall care of a patient and consults daily with the neurosurgeons. He is often involved in the decision to transfer a patient, with a head injury similar to Ms. Greene's, from the intensive care unit to the floor. His job involves reading and interpreting a patient's CT scans, and developing a course of treatment. Clearly, Dr. Miller's testimony is relevant to the issues in this case; specifically, the allegations by Ms. Stanfield that Dr. Neblett deviated from the standard of care in transferring Ms. Greene out of the intensive care unit and that he did not properly read the CT scans.

*iii. Harmless Error*

Even if we assume *arguendo* that the trial court erred either in its decision allowing the experts to testify in light of their Rule 26 disclosures or in finding that the experts were qualified to testify, based upon the findings of the jury, any error would be harmless. This court will only set aside a final judgment upon finding that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). The jury found that Dr. Neblett deviated from the standard of care. However, the jury also found that Dr. Neblett's deviation was not the legal cause of Ms. Greene's death. Even if we were to exclude the testimony of Dr. Samuels, Dr. Miller and Dr. Weiss, there is ample evidence in the record from which the jury could conclude that Dr. Neblett's deviation was not the legal cause of Ms. Greene's death. Dr. Neblett himself testified that the nursing staff should have contacted him earlier, and that this was a violation of their duty. Dr. Marvin Rozear, Ms. Stanfield's expert testified as to the inaccuracies in the nurse's notes. Moreover, Dr. Rozear testified that the nurses had a duty to contact Dr. Neblett, and had they done so the outcome would have been different. Dr. Isabelle Richmond, another expert for Ms. Stanfield, testified that the nurses erred in making notes in Ms. Greene's medical records. She further testified that the nursing staff should have contacted Dr. Neblett earlier and had they done so, Ms. Greene would have survived. Finally, the nurse treating Ms. Greene the night of her death testified that she knew that the standard of care required her to contact Dr. Neblett, and she did not do so. Based upon this testimony, the jury could conclude that Dr. Neblett's deviation from the standard of care was not the legal cause of Ms. Greene's death.

Moreover, the only substantive difference between the testimony of Ms. Stanfield's experts and the testimony of Dr. Neblett's experts was on the issue of whether Dr. Neblett deviated from the standard of care. Dr. Neblett's experts testified that he did not deviate while Ms. Stanfield's experts testified that he did deviate. As previously stated, the jury

found that Dr. Neblett did deviate from the standard of care. The jury, however, found that his deviation was not the legal cause of Ms. Greene's death, as testified to by Ms. Stanfield's own experts, and the treating nurse. Consequently, any error in allowing Dr. Neblett's experts to testify would be harmless.

*B. Ms. Stanfield's Experts*

Ms. Stanfield submits that the trial court erred in allowing Dr. Neblett's counsel to impeach her experts through the use of certain medical treatises. Specifically, Ms. Stanfield contends that Dr. Neblett should not have been allowed to question Dr. Richmond regarding the eighth edition of the ATLS Guidelines, as that edition was not in effect at the time of Ms. Greene's death and Dr. Richmond had just received that edition. Also, Ms. Stanfield contends that Dr. Neblett should not have been allowed to question Dr. Rozear regarding medical literature that had not been properly authenticated.

Tennessee Rule of Evidence 618 provides:

Impeachment of expert by learned treatises.

To the extent called to the attention of an expert witness upon cross-examination or relied upon by the witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness, by other expert testimony, or by judicial notice, may be used to impeach the expert witness's credibility but may not be received as substantive evidence.

On cross examination, counsel for Dr. Neblett questioned Dr. Richmond about the Glasgow Coma Scores as described in the ATLS guidelines. Dr. Richmond testified that ATLS was a reliable source and that she uses the ATLS guidelines for instructing physicians on how to treat cases like Ms. Greene's. Therefore, the requirement that the treatises be established as reliable was met. Also, Rule 618 does not contain a temporal requirement; moreover, we have neither been provided with, nor found any authority requiring that the publication be in effect at the time of the case. Even if there was such a requirement, Dr. Richmond admitted in her trial testimony that, while the seventh edition of the ATLS guidelines was used at the time of Ms. Greene's death, there was very little change between the seventh and eighth editions. At trial, Dr. Richmond asserted that she had not yet reviewed the eighth edition, but she testified at her deposition that there were no material

-14-

changes between the two editions. Consequently, we cannot find that the trial court erred in allowing Dr. Richmond to be questioned on the eighth edition of the ATLS guidelines.

Moreover, any error, if any, was harmless. The line of questioning involving the ATLS Guidelines concerned the question of whether a Glasgow Coma Score of thirteen indicated a minor head injury, as stated in the eighth edition, or a moderate head injury. Dr. Richmond admitted that, even if a score of thirteen indicated a moderate head injury, as opposed to a minor injury, there was a ninety percent chance of recovery. Based on the jury's finding that Dr. Neblett's deviation from the standard of care was not the legal cause of Ms. Greene's death, we cannot say that this questioning "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Therefore, any error by the trial court in allowing this type of questioning was harmless.

Ms. Stanfield also submits that the trial court erred in allowing Dr. Rozear to be questioned on medical literature that had not properly been established as reliable. In cross examining Dr. Rozear, counsel for Dr. Neblett asked him about literature on the use of Mannitol[6] and steroids to treat patients. Counsel did not refer to specific literature or attempt to read any literature. Counsel simply asked about the existence of literature that contradicted Dr. Rozear's opinions that Mannitol or steroids should have been ordered. Dr. Rozear admitted, upon questioning, that there was literature in existence opposing the use of steroids and Mannitol.

As previously stated by this Court:

> [O]nce an expert has given an opinion, he or she may be vigorously cross-examined to undermine the evidentiary weight of the opinion. *Brown v. Crown Equip. Co.*, 181 S.W.3d 268, 275 (Tenn. 2005); *Johnson v. John Hancock Funds*, 217 S.W.3d 414, 426 (Tenn. Ct. App. 2006). Opposing counsel should be given broad latitude in their cross-examination. *State v. Farner*, 66 S.W.3d 188, 208 (Tenn. 2001); *McDaniel v. CSX Transp., Inc*., 955 S.W.2d 257, 265 (Tenn. 1997). Thus, cross-examination may be used to require an expert to disclose and explain the facts or data upon which his or her opinion is based. Tenn. R. Evid. 705; *State v. Thacker*, 164 S.W.3d 208, 228 (Tenn. 2005). Just as an expert may be cross-examined regarding the facts or data he or she considered, an expert may be also cross-examined regarding the facts or data that he or she

---

[6]Mannitol is a prescription drug which may be used to treat head injuries.

did not consider and the reasons for not considering these facts or data.

***Duran v. Hyundai Motor Am., Inc.,*** 271S.W.3d 178, 197-198 (Tenn. Ct. App. 2008). In this case, counsel was not attempting to use a medical treatise to impeach Dr. Rozear as allowed by Tenn. R. Evid. 618 and suggested by Ms. Stanfield. Instead, counsel was cross-examining Dr. Rozear regarding her opinion that Dr. Neblett should have prescribed Mannitol or steroids to treat Ms. Greene. Accordingly, it was entirely appropriate for counsel to ask about the existence of, and Dr. Rozear's knowledge of, literature supporting opinions contrary to those of Dr. Rozear. Therefore, we find that the trial court did not abuse its discretion in allowing this line of questioning.

Ms. Stanfield also contends that the trial court erred in allowing counsel to question another expert on the ATLS Guidelines and to display, during questioning, a portion of the guidelines to the jury on a projection screen. While cross examining Dr. Arthur Daus, counsel for Dr. Neblett placed a page from the ATLS Guidelines on an projection screen so that the jury could read it. Dr. Daus is certified in ATLS and admitted, along with Dr. Richmond, that the ATLS Guidelines were reliable. No copy of the page displayed appears in the record for this Court to examine. From the transcript, it appears that the page displayed was from the eighth edition of the ATLS Guidelines. As discussed above, it was not error to allow questioning based on the eighth edition. Further, this Court finds that the trial court did not abuse its discretion in allowing the page to be displayed to the jury. The page was never actually read to the jury, nor was it admitted into evidence. Its display was merely an aid used by counsel in questioning Dr. Daus. We have neither been provided with, nor have we found, any authority to indicate that such display was improper. Accordingly, this Court cannot find that the trial court abused its discretion in allowing Dr. Neblett's counsel to display text of the ATLS Guidelines, which was established as reliable by at least two witnesses.

### III. Verdict Form

Ms. Stanfield also contends that language used in the Verdict Form was misleading and caused the jury to misunderstand her required showing. The question at issue on the Verdict Form provided:

> 2. If you find that Dr. Neblett deviated from the recognized standard of professional practice required of a neurosurgeon practicing in Jackson, Tennessee or a similar community in 2005 in his treatment of Ms. Greene, was that deviation a legal cause

of Ms. Greene's death which would not otherwise have occurred? (The Plaintiff has the burden of proof on this issue).

At trial, Ms. Stanfield requested that the trial court use the phrase "cause or contributed to," and objected to the use of "legal cause." According to Ms. Stanfield, the term "legal cause" implied to the jury that Dr. Neblett had to be the sole cause of Ms. Greene's death.

Rule 49.01 of the Tennessee Rules of Civil Procedure affords the trial court wide latitude to use a special verdict form as it deems appropriate. This Court reviews a trial court's verdict form under the same standard upon which we review the trial court's jury instructions. *Jordan v. CSX Transp., Inc*, No. M1999-01415-COA-R3-CV, 2001 WL 378555, *9 (Tenn. Ct. App. April 17, 2001). "The determination of whether jury instructions were proper is a question of law and therefore, our standard of review is *de novo* with no presumption of correctness." *Owens v. Methodist Health Care Sys.,* No. 02A019704CV00089, 1999 WL 360562, *2 (Tenn. Ct. App. June 7, 1999)( citing *Solomon v. First Am. Nat'l Bank*, 774 S.W.2d 935, 940 (Tenn. App. 1989)). We review the jury charge in its entirety to determine whether the trial court erred. *City of Johnson City v. Outdoor West, Inc*., 947 S.W.2d 855, 857 (Tenn. Ct. App. 1996)(citations omitted). This court will not invalidate the trial court's jury instructions as long as the legal issues involved are fairly defined and they do not mislead the jury. *Hunter v. Burke*, 958 S.W.2d 751, 756 (Tenn. Ct. App. 1997). Inconsistencies between the verdict form and the instructions may be misleading to the jury. *Jordan*, 2001 WL 378555 at *9 (citations omitted).

In instructing the jury, the trial court stated:

> A person or entity is at fault if you find that the person or entity was negligent and that the negligence was a cause in fact and legal cause of the injury or damage for which a claim is made.

> Fault has two parts: negligence and causation.

> *                    *                    *

> The second part of fault is causation.

> Causation has two components: (A) causation in fact and (b) legal cause.

> *                    *                    *

-17-

Two requirements must be met to determine whether a person or entity's negligent acts or omissions were a legal cause of the injury or damage.

1. The conduct must have been a substantial factor in bringing about the harm being complained of; and

2. The harm giving rise to the action could have been reasonably foreseen or anticipated by a person of ordinary intelligence and prudence.

To be a legal cause of an injury there is no requirement that the cause be the only cause, the last act, or the one nearest to the injury, so long as it is a substantial factor in producing the injury or damage.

\*                               \*                               \*

A single injury can be caused by the negligent acts or omissions of one or more persons or entities.

If you find that a person or entity was negligent and that the negligence was a cause in fact and also a legal cause of the injury or damages for which a claim was made, you have found that person or entity to be at fault. The plaintiff has the burden to prove the fault of Dr. Neblett. If the plaintiff fails to do so, you should find no fault on the part of Dr. Neblett. Dr. Neblett has the burden of proving that Jackson-Madison County General Hospital was at fault. If he fails to do so, you should find no fault on the part of Jackson-Madison County General Hospital. If you find more than one person or entity to be at fault, you must then determine the percentage of fault chargeable to each of them.

From these instructions and the verdict form, we cannot find that the trial court erred. The legal issues are fairly defined. There are no inconsistencies between the verdict form and the instructions. The trial court clearly defined legal cause and instructed the jury that more than one person or entity may be the cause of the injury or damages. The verdict form asks whether Dr. Neblett's deviation from the standard of care was "*a* legal cause." (emphasis added). It does not indicate, especially in light of the jury instructions, that Dr. Neblett had to be the sole cause. Accordingly, we do not find that the trial court erred in its

-18-

use of the term "legal cause" on the verdict form.

## IV. Powerpoint Presentations

Finally, Ms. Stanfield contends that the trial court erred in allowing Dr. Neblett's counsel to use a powerpoint presentation during opening and closing statements. As to the opening statement, Ms. Stanfield argues that she was prejudiced because Dr. Neblett's counsel was allowed to display evidence, not yet admitted, during opening statements. In regard to the closing arguments, Ms. Stanfield argues that the trial court erred in allowing Dr. Neblett's counsel to display portions of a purported trial transcript to the jury while making closing arguments. We will address each of these issues separately.

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." *Harris v. Baptist Memorial Hospital*, 574 S.W.2d 730, 732 (Tenn. 1978). "Trial courts have wide discretion in controlling arguments of counsel, including opening statements...." *State v. Johnson*, No. W2004-00464-CCA-R3-CD, 2005 WL 645165, *14 (Tenn. Crim. App. March 15, 2005)(citing *State v. Sutton,* 562 S.W.2d 820, 823 (Tenn. 1978)). Accordingly, this Court reviews the trial court's decisions on arguments under an abuse of discretion standard. *Id.* "A trial court should provide both parties the opportunity to present their case and the facts upon which they intend to rely, so long as those facts are deemed likely to be supported by admissible evidence. *Id.* (citing *State v. Stout*, 46 S.W.3d 689, 713 (Tenn. 2001)).

Ms. Stanfield argues, in part, that she was prejudiced because the trial court had previously ruled that the parties would not be allowed to use a powerpoint presentation in opening arguments. We have reviewed the transcript of the pretrial conference and disagree. First, there is nothing in the order from the pretrial hearing which addresses the issue of powerpoint presentations. During the conference, counsel for Ms. Stanfield asked about the use of powerpoint, explaining that another trial judge had not allowed him to use a powerpoint presentation unless everything shown had already been admitted into evidence. After hearing this, the trial court stated that he agreed with the other judge and would not allow it unless the parties agreed to it. In response to a question from the trial court, counsel for Dr. Neblett stated that she intended to use a powerpoint presentation during her opening, but would not put on any evidence that she would not use in the case. The trial court asked the parties to exchange information and stated that, if there was not an agreement, he would consider the issue prior to the trial beginning. The trial court in no way held that powerpoint presentations would not be allowed. Instead the trial court simply held that the use of evidence not already admitted into evidence would need to be agreed upon by the parties or pre-approved by the court. Moreover, based upon counsel's statements, Ms. Stanfield's

counsel should have been fully aware that Dr. Neblett's counsel planned to use a powerpoint presentation during opening statements. Further, prior to opening arguments, the record indicates that counsel for Ms. Stanfield was provided with an approximate twenty minute recess to review the slides. No specific objection was made as to any of the material contained in the presentation.

Ms. Stanfield also contends that she was prejudiced because the powerpoint presentation contained documents not admitted into evidence. We find this argument to be disingenuous. While we do not have a copy of the presentation made, which would certainly be helpful, it appears from the record that the only exhibits presented during the opening statements were the medical records of Ms. Greene and possibly Dr. Neblett's curriculum vitae. During the pretrial conference, counsel for Ms. Stanfield himself asked for an agreed order stipulating to the medical records so that the parties could work from the same exhibit. Counsel for Dr. Neblett agreed to this stipulation. Moreover, the first action by counsel for Ms. Stanfield, upon beginning the presentation of the evidence, was to introduce the stipulated records into evidence, stating that it was by the agreement of the parties. While at the time of opening statements, the records had not been formally admitted into evidence, they had already been stipulated to on the record at the request of Ms. Stanfield's counsel. At no point during the proceedings was the admissibility of the medical records questioned. Dr. Neblett's curriculum vitae appears in the record as an exhibit and he testified as to his background and training. Ms. Stanfield has neither cited to, nor have we found, any place in the record where Ms. Stanfield objected to this exhibit or Dr. Neblett's testimony. Consequently, we do not find that the trial court abused its discretion in allowing Dr. Neblett's counsel to use a powerpoint presentation, as previously disclosed, to present stipulated and properly admissible evidence to the jury during her opening statement.

As to closing arguments, Ms. Stanfield contends that the trial court erred in allowing Dr. Neblett's counsel to present portions of the trial transcript to the jury on a projection screen during closing arguments. During closing arguments, counsel for Dr. Neblett presented portions of the trial transcript, as prepared by the court reporter but not yet certified, on a screen as part of her argument. Counsel for Ms. Stanfield objected to this prior to the use of the transcript. The trial court overruled the objection and allowed counsel for Dr. Neblett to proceed.

"Closing argument is a crucial component of any jury trial." *McCrory v. Tribble*, No. W2009-00792-COA-R3-CV, 2010 WL 1610857, * 6 (Tenn. Ct. App. April 22, 2010). Closing arguments allow counsel to present their theory of the case and to point out strengths and weaknesses in the evidence. "[C]ounsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments." *Anderson v. State*, No. E2008-00439-CCA-R3-PC, 2009 WL 2474673, *6 (Tenn. Crim App.

April 13, 2009). As with all other arguments by counsel, this Court reviews the trial court's decisions on closing arguments under an abuse of discretion standard. *Perkins v. Sadler*, 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991).

Ms. Stanfield contends that counsel should not be allowed to display unauthenticated portions of the trial transcript to the jury during closing arguments. She has not provided this Court, nor have we found, any authority to support her position. Ms. Stanfield argues that a party is prohibited from using otherwise inadmissible evidence during a closing argument. She is correct. However, there is no indication in the record that the testimony presented by Dr. Neblett's counsel was inadmissible testimony. Ms. Stanfield also relies on *Godbee v. Dimick,* 213 S.W.3d 865, 875 (Tenn. Ct. App. 2006), where this Court held that it would be improper to allow written transcripts to be taken into the jury room. We agree that it would be improper for the jury to take the trial transcript into the jury room. However, there is no indication that was done in this case.

It is well established that there is nothing wrong with reminding the jury of the testimony of various witnesses in closing argument. *Perkins v. Sadler*, 826 S.W.2d at 442. "[C]ertainly in closing argument one can properly utilize a summation of trial testimony, and it should not be improper for this to be done in a question answer form." *Id.* This is exactly what counsel for Dr. Neblett was attempting to accomplish. She displayed portions of the trial transcript to the jury in order to remind them of the testimony given. She chose portions of the testimony to emphasize the strengths of Dr. Neblett's theory of the case, and the weaknesses of Ms. Stanfield's theory. Counsel for Ms. Stanfield similarly reminded the jury of certain portions of the testimony given in his closing argument and rebuttal for the same purpose. He, however, chose not to display the portions of the testimony that he viewed as important to his case and argument. We have found no authority to indicate that counsel should not be able to display portions of the transcript to the jury during closing arguments. In fact, Tennessee Code Annotated § 20-9-303 provides:

> In the trial of any civil suit, counsel for either party shall be permitted to use a blackboard, model or similar device, also any picture, plat or exhibit introduced in evidence, in connection with counsel's argument to the jury for the purposes of illustrating the counsel's contentions with respect to the issues that are to be decided by the jury, provided, that counsel shall not, in writing, present any argument that could not be properly made orally.

Counsel for Dr. Neblett was acting within the provisions of this statute. She displayed portions of the trial transcript in order to make the same arguments she would have been

allowed to make orally. Consequently, we do not find that the trial court erred in allowing counsel to display portions of the trial transcript during closing arguments.

Also in regard to closing arguments, Ms. Stanfield argues that there is no way to know whether the transcript shown was accurate as the transcript had not yet been authenticated or certified by the court reporter. We note that the record does not contain a copy of what was displayed to the jury. We have only the transcript of the closing arguments. From our review of the transcript, we cannot determine what was displayed as opposed to what was simply stated by Dr. Neblett's counsel. Both sides concede that what was displayed was obtained directly from the court reporter. Moreover, counsel for Ms. Stanfield was present when portions of the transcript were displayed to the jury. At no point did he object to what was being displayed or indicate on the record that he believed the transcript was inaccurate. Further, Rule 6 of the Court of Appeals requires Ms. Stanfield to provide citations to the record as to where an alleged prejudice is recorded. Ms. Stanfield's brief provides no such citations to support her argument that the transcript shown was inaccurate or that she was prejudiced because the transcript had not yet been certified. Accordingly, we cannot find that she was prejudiced by Dr. Neblett's use of portions of the transcript during his counsel's closing argument.

Also in regard to the display of the transcript, it appears that Ms. Stanfield objects because the testimony displayed was taken out of context. As stated above, closing arguments are a tool used by counsel to summarize their theory of the case, to remind the jury of the evidence supporting their theory, and also to point out weaknesses in the opposing counsel's argument. Often when doing so, counsel will remind the jury of a portion of a witness' testimony that favors their case and not point out testimony that favors the opposing party. Opposing counsel has the opportunity in his or her closing argument or rebuttal to point out testimony that was not mentioned and make his or her argument accordingly. The fact that the testimony was displayed instead of merely read or paraphrased does not change what counsel is allowed to state in closing arguments. As noted by the trial court, any argument that the testimony was being taken out of context could have properly been addressed by counsel in rebuttal. This is the same manner in which counsel could have addressed Dr. Neblett's argument, had his argument not been displayed, but instead made completely orally. Therefore, we do not find that the trial court abused its discretion in allowing counsel to display portions of the trial transcript, as prepared by the court reporter, to the jury during closing arguments.

### V. Conclusion

For the foregoing reasons, we affirm all aspects of the trial court's judgment. Costs of this appeal are taxed against the Appellant, Teresa Lynn Stanfield, and her surety.

_____
J. STEVEN STAFFORD, J.