IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 16, 2018

## STATE OF TENNESSEE v. RICHARD SHAWN O'ROURKE

**Appeal from the Circuit Court for Lawrence County**
**No. 30677      Stella Hargrove, Judge**

_____

### No. M2017-00375-CCA-R3-CD

_____

The Defendant, Richard Shawn O'Rourke, was convicted by a Lawrence County Circuit Court jury of rape, a Class B felony. *See* T.C.A. § 39-13-503 (2014). The trial court sentenced the Defendant as a Range I, standard offender to ten years, six months' incarceration at 100% service. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction and (2) the State engaged in prosecutorial misconduct. Because the State engaged in multiple instances of prosecutorial misconduct during closing argument, we reverse the judgment of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Kevin S. Latta (on appeal) and William Joshua Morrow (at trial), Columbia, Tennessee, for the appellant, Richard Shawn O'Rourke.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Christi Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case arises from the rape of the Defendant's intellectually disabled niece, who was age sixteen at the time of the incident. At the April 7, 2015 trial, the victim's mother testified that the victim had been diagnosed with a cognitive learning disability and had an I.Q. below 70. The victim's mother stated that the victim, age nineteen at the time of the trial, was still in high school and that the victim was placed in the "Special

Needs Department." The victim's mother said that the victim was classified as a high school junior but that her development was consistent with a third- or fourth-grade level.

The victim's mother testified that the Defendant was her brother-in-law and that the incident occurred in April 2012. The victim's mother stated that she, her husband, the victim, and her younger son traveled to Chicago to celebrate her older son's boot camp graduation. The victim's mother said that the Defendant had been staying in the family's home for a few months before the incident and that he stayed in the home while the family traveled to Chicago. The victim's mother said that after the family arrived at home, everyone went to bed. The victim's mother stated that her bedroom was located on the main floor and that the victim, her younger son, and the Defendant each had a bedroom in the basement.

The victim's mother testified that she awoke the next morning around 7:30 a.m., that the victim was in her room sleeping alone, and that she told the victim the family was going to church. The victim's mother stated that before leaving for church, the victim shared with her information relative to an incident with the Defendant and that the victim's mother called the police.

On cross-examination, the victim's mother testified that the victim understood the difference between right and wrong, that she and the victim had prior conversations about sexual activity, and that the victim was not sexually active before the incident. The victim's mother stated that the Defendant was awake when the family arrived home from Chicago, that the Defendant appeared intoxicated but alert, and that the Defendant consumed alcohol daily. The victim's mother stated that she told the victim and her younger son to go to bed, that she saw both children walk downstairs, and that she went to bed. The victim's mother said that she slept through the night and that she did not hear any noises coming from downstairs.

The victim testified that she was age nineteen and that the Defendant was her uncle. The victim stated that she lived with her parents and younger brother and that her bedroom was located in the basement of her home. The victim said that she and her family went to Chicago to watch her older brother graduate, that the Defendant stayed home, and that the Defendant was home when the family returned.

The victim testified that she went to bed in her room and that her "hole" began hurting because she had not consumed water. The victim stated that she went in the Defendant's bedroom to tell him that she was in pain and that the Defendant's room was the closest room in proximity to her bedroom. The victim said that the Defendant asked "would you like me to rub it to make it feel better," that the Defendant rubbed "inside of [her]," and that she did not want the Defendant to touch her. The victim stated that the Defendant rubbed her "bladder." When asked to stand and point to the area the Defendant "rubbed," the victim pointed to her vaginal area. The victim stated that she

-2-

was wearing panties and a nightgown, that the Defendant "was rubbing it inside [her] panties" with his hand, and that "I just kept saying, 'uh-huh,' but I don't know it." When asked whether the Defendant's hand "went inside [her] body," the victim responded "yes." The victim said that she lay on the bed with the Defendant, that the Defendant "rubbed" her for a while, that the Defendant fell asleep, and that the Defendant awoke and touched her breasts under her nightgown with his hands. The victim stated that when the Defendant touched her breasts, she noticed a "flying thing," that "the flying thing was just like a little imagination to me as an angel," and that it was probably a bug in the lampshade.

The victim testified that the Defendant fell asleep again and that the Defendant walked her to her bedroom around 5:00 a.m. The victim stated that the Defendant "didn't want me to tell . . . my parents that he was touching me down my body." The victim stated that she asked the Defendant to stop touching her during the incident and that the Defendant did not stop. The victim said that the Defendant asked whether she "ever touched myself down there, and I just told him, 'Whenever I, like, wash my body and stuff like that.'" The victim stated that her mother woke her up the following morning for church. The victim said that she asked her father, "[W]hy does [the Defendant] do weird things?," as they were leaving for church and that she told her family the Defendant "touched me in my body."

On cross-examination, the victim acknowledged she had practiced testifying with the State but that neither the State nor her parents told her what to say at the trial. The victim stated that she understood the difference between the truth and a lie and that she told the truth during her testimony. The victim said that she told her parents that the Defendant "was just rubbing" with his hands and that the Defendant did not "put anything inside of me." The victim stated that she knew what the Defendant did was wrong and that she waited to tell her parents until the morning because she was scared. The victim said that the Defendant rubbed inside of her body, although she later said that "nothing went inside of my body . . . I'm pretty sure about that." The victim stated that it "hurt while he was touching me inside my body" and that she did not think the Defendant placed his hands inside her "hole." The victim stated that the Defendant touched her on the outside of her body but that it hurt inside her body.

On redirect examination, the victim testified that the Defendant "didn't rub me in there" and that the Defendant did not "touch it - me in the hole." The victim stated that the Defendant touched her with his hand in the area around her "hole."

Lawrence County Sheriff's Sergeant Tony Beard testified that he went to the family home on April 22, 2012, and that he spoke with the victim's parents about the incident. Sergeant Beard stated that the Defendant was in a basement bedroom and that he escorted the Defendant outside because the victim's father no longer wanted the Defendant in the home.

On cross-examination, Sergeant Beard testified that on the Tennessee Incident Base Reporting System (TIBRS) form, he initially entered the offense as aggravated sexual battery but later amended it to rape after speaking with the District Attorney General. On redirect examination, Sergeant Beard testified that he wrote his report before speaking with the victim.

The victim's father testified that he and the Defendant were brothers and that the Defendant was staying in his home at the time of the incident. The victim's father said that he and his family returned home from Chicago on the night of April 21, 2012, and that the family went to bed soon after arriving home. The victim's father stated that the family woke the next morning to go to church, that he noticed the victim had a "bothered look on her face," and that he asked the victim if something was wrong. The victim's father said that based on the information the victim provided, he went downstairs to the Defendant's bedroom, "grabbed [the Defendant], and told him it was time to leave." The victim's father stated that he saw vodka bottles and "remnants of marijuana in coat pockets" in the Defendant's bedroom.

The victim's father testified that the Defendant had been living in his home for about one week before the incident. The victim's father testified that the victim's mother called the police and that officers arrived at their home. The victim's father stated that after he told the Defendant to leave the home, the Defendant fell asleep and that officers escorted the Defendant outside.

Lawrence County Sheriff's Lieutenant Nathan Neese testified that when he arrived at the home, he placed the Defendant in his patrol car and that he advised the Defendant of his *Miranda* rights. Lieutenant Neese stated that the Defendant signed a form waiving his *Miranda* rights, that the Defendant agreed to speak with him, and that the Defendant signed a statement. The Defendant's statement was introduced as an exhibit and read to the jury. In the statement, the Defendant said that the family returned home from Chicago, that he was intoxicated, and that he went to bed. The Defendant stated that he awoke at 6:00 a.m., that the victim was in his bed, and that he told the victim to go to her bedroom. The Defendant denied touching the victim inappropriately and having any sexual contact with the victim. On cross-examination, Lieutenant Neese testified that the Defendant was cooperative and that the Defendant signed the statement he had written.

Upon this evidence, the Defendant was convicted of rape. This appeal followed.

## I. Sufficiency

The Defendant contends that the evidence is insufficient to support his conviction because the State failed to prove the element of penetration beyond a reasonable doubt. The State responds that the evidence is sufficient to support the Defendant's conviction. We agree with the State.

-4-

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A conviction may be based upon circumstantial evidence alone. *See Dorantes*, 331 S.W.3d at 380-381.

Tennessee Code Annotated section 39-13-503 defines rape as:

(a) [The] unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:

. . .

(3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless[.]

Sexual penetration is defined as:

sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]

*Id*. § 39-13-501(7) (emphasis added).

In the light most favorable to the State, the evidence is sufficient to support the Defendant's rape conviction. The victim testified that the Defendant rubbed "inside of [her]" and that she told her parents that the Defendant "touched [her] in her body." The State asked the victim whether the Defendant's hand "went inside [her] body," and she replied "yes." The victim stated that she "hurt while he was touching me inside my

body." The victim said that the Defendant touched the inside area around her "hole" with his hand. Our supreme court has held that "it is not necessary that the vagina be entered or that the hyman be ruptured; the entering of the vuvla or labia is sufficient" for sexual penetration to occur. *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000); *see State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001); *see State v. Brandon Lee Clymer*, No. M2016-01124-CCA-R3-CD, 2017 WL 5197292 at *8 (Tenn. Crim. App. Nov. 10, 2017), *perm. app. denied* (Tenn. Mar. 14, 2018).

Although the victim's testimony included inconsistencies about whether sexual penetration occurred, her credibility was an issue before the jury, and its verdict reflects that it credited her testimony that digital penetration occurred. We note that the Defendant does not dispute that the victim was "mentally incapacitated." In the light most favorable to the State, we conclude that the evidence is sufficient to support the Defendant's conviction. The Defendant is not entitled to relief on this basis.

## II. Prosecutorial Misconduct

The Defendant contends that multiple instances of prosecutorial misconduct occurred during the State's opening statement and closing argument. The State responds that the Defendant has waived appellate review of this issue by failing to object contemporaneously to the State's comments and by failing to raise the issue in his motion for a new trial. In the alternative, the State argues that the Defendant is not entitled to plain error relief.

The record reflects that the Defendant failed to object to the statements that he alleges constitute prosecutorial misconduct. Likewise, the Defendant failed to raise this issue in his motion for a new trial. *See* T.R.A.P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . misconduct of . . . parties or counsel . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Our review is limited to plain error. *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

Five factors are relevant

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). All five factors must exist in order for plain error to be recognized. *Id.* at 283. "[C]omplete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the trial." *Id.*; *Adkisson*, 899 S.W.2d at 642.

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). *See* T.R.A.P. 36(b). In determining whether prosecutorial misconduct affected the jury verdict to the prejudice of a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7–106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See Cauthern*, 967 S.W.2d at 737; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5.  It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

> Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*Goltz*, 111 S.W.3d at 6.

## A.  Opening Statement

The Defendant alleges that prosecutorial misconduct occurred during the opening statement because the Assistant District Attorney misled the jury about the inferences it could draw from the evidence presented at the trial.  The record reflects the following:

> It will be obvious to you about what [the victim's] disabilities are. What will be also, *I believe*, obvious to you is that [the victim] comes to you with no motivation whatsoever to tell you anything untrue.  *That even if she had such motivation, she couldn't if she wanted to.  Her abilities are not there.*
>
> But she knows what happened to her in that bedroom that night, and she will tell you that.

(Emphasis added).

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intended to prove."  *State v. Reid*, 164 S.W.3d 286, 343 (Tenn. 2005).  Opening statements are not evidence.  *State v. Thompson*, 43 S.W.3d 516, 523 (Tenn. Crim. App. 2000).  Trial courts should allow the parties to present "a summary of the facts supportive of the respective theories of the case, only so long as those 'facts are deemed likely to be supported by admissible evidence.'"  *State v. Sexton*, 368 S.W.3d 371, 415 (Tenn. 2012) (quoting *Stanfield v. Neblett*, 339 S.W.3d 22, 41-42 (Tenn. Ct. App. 2010)).  Therefore, opening statements should "be predicated on evidence introduced during the trial" and should never refer "to facts and circumstances which are not admissible in evidence."  *Sexton*, 368 S.W.3d at 415.

The prosecutor's statement regarding the victim's inability to lie was improper. The State must only present facts during its opening statement that are likely to be proven by evidence during the trial.  The court found the victim competent to testify, and no evidence was introduced at the trial suggesting that the victim was unable, due to her

intellectual disability, to testify falsely. The prosecutor's statement was improper because it is unprofessional conduct for the prosecutor to intentionally misstate the evidence or mislead the jury as to the inferences it could draw. *See Goltz*, 111 S.W.3d at 6. We note that the trial court did not provide a curative instruction.

## B. Closing Argument

The Defendant asserts that the prosecutor committed misconduct during closing argument by characterizing the Defendant as a "sexual predator," by making unprofessional comments relative to the victim's credibility, and by injecting issues broader than the guilt or innocence of the accused under the controlling law. The State responds that the Defendant has waived appellate review of this issue and that plain error relief is not warranted.

Closing argument is "a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001); *see Bane*, 57 S.W.3d at 425; *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). However, closing argument "must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *Goltz*, 111 S.W.3d at 5; *see State v. Jordan*, 325 S.W.3d 1, 64 (Tenn. 2010). A trial court has significant discretion in controlling closing argument, and its decisions relative to the contents of an argument may only be reversed upon an abuse of discretion. *Terry*, 46 S.W.3d at 156; *Cauthern*, 967 S.W.2d at 737; *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975).

## 1. Sexual Predator Characterization

The Defendant asserts that the prosecutor improperly characterized the Defendant as a "sexual predator" and that this characterization inflamed the passions or prejudices of the jury. The Defendant asserts that the State's "use of the term 'sexual predator' was [falsely] suggestive of the idea to the trial jurors that the Defendant[] had previously been adjudicated guilty of a predatory sexual offense." The record reflects the following during the prosecutor's closing argument:

> [The Defendant] wasn't drunk out of his mind to the point where he didn't know what he was doing. He went downstairs to bed. She came in there because she was complaining of pain and he took advantage he saw his opportunity. . . . *That's the opportunity a sexual predator looks for.*

(Emphasis added). On rebuttal, the State said:

> *What do we do with a sexual predator who knows or is smart enough to figure out how to work the system?* What do we do? No eyewitness. No eyewitness. They're very careful. He's very careful.

(Emphasis added).

The State improperly characterized the Defendant as a sexual predator. Our criminal statutes do not define "sexual predator." However, Merriam-Webster defines "predator" as someone who "injures or exploits others for personal gain or profit." *Predator*, THE MERRIAM-WEBSTER DICTIONARY (New ed. 2018). "Sexual predator" is defined as "a person who has committed a sexually violent offense and especially one who is likely to commit more sexual offenses." *Sexual Predator, id.* The fact that a sexual predator is likely to commit sexual offenses in the future calls upon the jury to find the Defendant guilty to prevent him from reoffending, which is an improper argument. *See Goltz*, 111 S.W.3d at 5 ("[A]rguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law.") (internal citations omitted). The record does not reflect that the Defendant has previous convictions for a crime of this nature, and the presentence report shows that the Defendant's prior convictions are all misdemeanors. Such characterization likely inflamed the passion and prejudice of the jury. *See Cauthern*, 967 S.W.2d at 737; *see Keen*, 926 S.W.2d 727. We conclude that these statements were improper and constituted prosecutorial misconduct. We note that the trial court did not provide a curative instruction.

**2. Comments Relative to the Credibility of the Victim**

The Defendant asserts that the prosecutor made improper comments regarding the credibility of the victim. The Defendant asserts that the prosecutor committed misconduct by calling the victim a "hero" and by stating repeatedly that the victim did not have the mental capacity to lie. The record reflects that the prosecutor made the following arguments relative to this issue:

> I told you yesterday this would not be a technical and scientific case. This is a case that's going to turn on your perception, and your observation, and your questioning and finding credible [the victim].
>
> *[The victim] has quickly become a hero of mine.* She was one of the bravest little girls I've ever seen come into this courtroom, take this witness stand in front of strangers, and talk about some of the most intimate things that none of [us] would talk about in the light of day.
>
> . . .
>
> *I suggest to you, she probably doesn't have the ability to come in this room and tell you anything but the truth.* She is innocent. She – she has no motivation. There was no motivation shown to you for anything other than telling the truth.

-10-

. . .

> In general, does the witness have any special reason to tell the truth or any special reason lie?  Again, *I don't know that this witness has the ability to come in here and lie to you.*  She's exhibited and there's no evidence before you of any reason whatsoever for her to make this up or fabricated this against her uncle.

(Emphasis added).  On rebuttal, the State said:

> [The victim] woke up the next morning and on the way out the door to church to sing in the choir she said, "No, this stops right here, right now.  He's not going to get away with it.  I'm telling somebody what happened."
>
> *Like I said, she's become my hero.*  She's a brave little girl to do that with this big man downstairs still in the bed, still in the house.  But she said, "No.  It's not going to happen.  This is wrong."

(Emphasis added).

The prosecutor stated several improper personal opinions as to the truth of the victim's testimony.  *See Thornton*, 10 S.W.3d at 235; *Lackey*, 578 S.W.2d at 107.  Vouching for a witness's credibility occurs when a prosecutor expresses personal opinion that a witness is telling the truth.  *See, e.g., Sexton*, 368 S.W.3d at 419-20; *Goltz*, 111 S.W.3d at 6-7.  The prosecutor stated, "[T]his is a case that's going to turn on your perception, and your observation, and your questioning and finding credible [the victim] . . . [the victim] has quickly become a hero of mine. . . ."  The prosecutor again described the victim as her "hero" during rebuttal argument.  The prosecutor impermissibly vouched for the victim's general character by describing the victim as her "hero."  Our supreme court has repeatedly condemned a prosecutor's expression of personal belief in the truth or falsity of evidence.  *See, e.g., Sexton*, 368 S.W.3d at 420.

The prosecutor also made several comments relative to the victim's inability to lie.  The victim was examined under oath by the trial court to ensure that she was competent to testify.  The record reflects that both the State and trial counsel had the opportunity to question the victim regarding her perception of reality and her understanding of the difference between the truth and a lie.  After her examination was completed, the court stated, "The Court makes the finding that [the victim] understands the oath.  She qualifies as a witness under the law.  And the Court will allow her to testify, finding that she understands the difference between the truth and a lie."

-11-

The prosecutor's arguments that the victim did not have the ability to lie were improper. The trial court explicitly found that the victim understood the difference between the truth and a lie. The victim made several statements during the examination that she understood that she had to tell the truth while under oath and testified during cross-examination that she understood the difference between the truth and a lie. The prosecutor misstated the evidence and made several personal comments relative to the credibility of the victim. *See Goltz*, 111 S.W.3d at 6. Furthermore, no evidence or testimony reflected that the victim was incapable of lying. We also note that the improper arguments the prosecutor made during her rebuttal argument were not in response to trial counsel's closing argument. The prosecutor's arguments that the victim was incapable of lying were improper, and the trial court did not provide a curative instruction.

### 3. Broader Issue than Guilt or Innocence

The Defendant's final contention is that one of the State's remarks diverted the jury from its duty by interjecting issues broader than guilt or innocence of the accused. The record reflects that the prosecutor made the following argument:

> If we do not give credence to the voice of [the victim] and to her account of what happened there that night, I'm afraid we declare open[] season on children of this type, on the vulnerable of our society.

The prosecutor's argument implied to the jury that if it found the Defendant not guilty, other mentally incapacitated individuals and children would be at risk. Our supreme court has been clear that it is improper to argue such issues during closing argument. *See Cauthern*, 967 S.W.2d at 737; *Keen*, 926 S.W.2d at 736; *Goltz*, 111 S.W.3d at 6. We conclude that the prosecutor's argument was improper. We note that the trial court did not provide a curative instruction.

The Defendant has established the presence of all five *Adkisson* factors for plain error relief. *Adkisson*, 899 S.W.2d at 641-42. The record clearly established what occurred during the trial and includes the transcript of the State's opening statement and closing argument. *See id*. The Defendant has shown that a clear and unequivocal rule of law has been breached. *See id*. The prosecutor in this case improperly characterized the Defendant as a "sexual predator" multiple times during her closing argument. Our supreme court has held that it is improper to use arguments calculated to inflame the passions and prejudices of the jury. *See Goltz*, 111 S.W.3d at 6; *Cauthern*, 967 S.W.2d at 737; *Stephenson*, 878 S.W.2d at 541. Furthermore, the prosecutor improperly vouched for the victim's credibility by calling the victim her "hero" and argued multiple times to the jury that the victim did not have the ability to lie. Our supreme court has been clear that it is improper to express personal opinions as to the truth of any testimony. *See Goltz*, 111 S.W.3d at 6; *Thornton*, 10 S.W.3d at 235; *Lackey*, 578 S.W.2d at 107.

Finally, the prosecutor improperly interjected issues broader than the guilt or innocence of the Defendant by arguing that failing to convict the Defendant may lead to similar offenses against other mentally incapacitated individuals or children. *See Goltz*, 111 S.W.3d at 6; *Cauthern*, 967 S.W.2d at 737; *Keen*, 926 S.W.2d 727. The Defendant had a right to a fair trial, and the prosecutor's improper arguments, taken in the aggregate, adversely affected such right. *Adkisson*, 899 S.W.2d at 641-42.

The record does not reflect that the Defendant failed to object during the prosecutor's closing argument for a tactical purpose, and we note that neither party asserts such argument. *See id*. Finally, plain error relief is "necessary to do substantial justice." *See id*. As the prosecutor stated, no eyewitnesses observed this incident between the Defendant and the victim. The Defendant denied having any sexual contact with the victim in his police statement. The only evidence contrary to the Defendant's statement is the victim's testimony, and the outcome of the case hinged on the victim's credibility. We conclude that the State's improper arguments, especially regarding the credibility of the victim, probably changed the outcome of the trial to the prejudice of the Defendant. *See id*. at 642. The Defendant has established that he is entitled to a new trial as a matter of plain error.

In consideration of the foregoing and the record as a whole, we reverse the judgment of the trial court and remand for a new trial.

_____
ROBERT H. MONTGOMERY, JR., JUDGE