IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 24, 2026 Session

## RILEY DAVIDSON v. SHELBYVILLE HOSPITAL COMPANY, LLC

**Appeal from the Circuit Court for Bedford County**
**No. CT-13755     M. Wyatt Burk, Judge**

———————————————————————

**No. M2025-00905-COA-R3-CV**

———————————————————————

This appeal arises out of a health care liability claim. The case proceeded to trial, and the jury entered a verdict in favor of the appellee-defendant. The appellant-plaintiff appeals the trial court's acceptance of two of defendant's expert witnesses. Upon diligent review of the record, we conclude that the trial court erred in allowing defendant's causation expert witness to testify about his interpretation of a diagnostic image when his opinion about that image had not been properly disclosed as required by the Tennessee Rules of Civil Procedure. We also conclude that this error more probably than not affected the judgment. We further conclude that the trial court erred in allowing defendant's standard-of-care expert witness to testify despite not satisfying the locality rule contained in the Health Care Liability Act. However, we conclude that this error did not more probably than not affect the judgment. We vacate the jury's verdict and the trial court's judgment and remand this matter for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated;**
**Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which CARMA DENNIS MCGEE and VALERIE L. SMITH, JJ., joined.

W. Bryan Smith and Chad D. Graddy, Memphis, Tennessee, for the appellant, Riley Davidson.

Heather M. Gwinn, James R. Embrey, Jr., and Lauren S. Spicer, Franklin, Tennessee, for the appellee, Shelbyville Hospital Company, LLC.

## OPINION

### BACKGROUND

On February 18, 2020, Riley Davidson ("Plaintiff") presented to Tennova Family Care, also known as Tennova Urgent Care ("TUC"), an urgent care clinic in Shelbyville, Tennessee owned and operated by Shelbyville Hospital Company, LLC ("Hospital"), for treatment of an upper respiratory infection and sinusitis. Plaintiff was examined by Courtney Clardy, a family nurse practitioner employed by Hospital. Ms. Clardy instructed Danielle Prince, a licensed practical nurse working under Ms. Clardy's supervision, to inject an intramuscular steroid into Plaintiff's right dorsogluteal muscle.

On February 17, 2021, Plaintiff filed a complaint against Hospital and Ms. Clardy (together, "Defendants") in the Bedford County Circuit Court (the "trial court") alleging medical negligence. In the complaint, Plaintiff avers that Ms. Clardy, Hospital staff, and/or staff under Ms. Clardy's supervision negligently administered the steroid injection. She alleges that approximately ten minutes after leaving TUC, she called the clinic and reported that she was "experiencing 'a lot' of pain at the injection site and down her leg once she got in her car." Plaintiff further avers that she later presented to the emergency room at Tennova Healthcare – Shelbyville Hospital and was diagnosed with "foot drop, right foot." Plaintiff alleges that she has suffered, and will continue to suffer, permanent nerve damage as a result of Defendants' purported negligence. On April 16, 2021, Defendants filed an answer denying that the steroid injection was negligently administered to Plaintiff.

Defendants sent Plaintiff their expert witness disclosures pursuant to Tennessee Rule of Civil Procedure 26.02(4) on February 20, 2023. Defendants gave notice that Paul R. Carney, M.D., a neurologist licensed and practicing in Missouri, had reviewed Plaintiff's medical records and was expected to testify at trial

> regarding the injuries alleged by Plaintiff, the medical care and treatment provided to Plaintiff for those injuries, and the factors contributing to Plaintiff's recovery. Dr. Carney is expected to testify that all of the care and treatment provided to Plaintiff in February 2020 was within the standard of care applicable to nurses working in a clinic such as Tennova Family and Urgent Care Clinic.

On October 30, 2023, Defendants supplemented their Rule 26 expert witness disclosures. As to Dr. Carney, the supplemental disclosure stated, in relevant part, as follows:

**a. The subject matter on which the expert is expected to testify:**

Based upon his education, training, and experience, as well as his review of pertinent medical records, Dr. Carney is expected to provide testimony regarding the cause of Plaintiff's alleged injury and related symptoms, the clinical course of recovery from such an injury, and interpretation of the EMG studies performed by Plaintiff's treating physicians.

**b. The substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion:**

Dr. Carney has reviewed Plaintiff's medical records both prior to and after the administration of the intramuscular solumedrol injection on February 18, 2020, as well as the MRI report of February 25, 2020, and the EMG studies performed on February 27, 2020, December 17, 2020, August 19, 2021, and September 21, 2021. Based on his education, training and experience, as well as his review of medical records and diagnostic studies, Dr. Carney is expected to testify that Plaintiff did not suffer permanent damage to her sciatic nerve as a result of the injection administered on February 18, 2020. . . .

The MRI of Plaintiff's pelvis performed on February 25, 2020, showed some swelling in her gluteus maximus region right where the cortisone injection was given but nothing around the sciatic nerve. . . .

Plaintiff deposed Dr. Carney on November 1, 2023. During this deposition, Plaintiff's counsel reviewed Defendants' supplemental expert witness disclosure with Dr. Carney and asked him about the diagnostic studies he had reviewed. Dr. Carney confirmed that he had looked at the reports from the EMG and MRI studies. When asked whether he had "look[ed] at the imaging on the MRI[,]" Dr. Carney responded, "I'm not a radiologist."

Defendants supplemented their Rule 26 expert witness disclosures again on July 16, 2024. As to Dr. Carney, this latest supplemental disclosure stated:

a. *Summary of Medical Records and Other Documents Reviewed*

Based upon his education, training, and experience, as well as his review of pertinent medical records, Dr. Carney is expected to provide testimony regarding the cause of Plaintiff's alleged injury and related symptoms, the clinical course of recovery from such an injury, and

interpretation of the EMG and MRI studies performed by Plaintiff's treating physicians.

On July 18, 2024, Plaintiff filed a notice of voluntary dismissal without prejudice of her claim against Ms. Clardy. The trial court entered an order dismissing without prejudice Plaintiff's claim against Ms. Clardy on July 23, 2024.

The case proceeded to a jury trial on August 26–30, 2024. Ms. Prince testified first. She explained that a dorsogluteal injection is "when you give a shot in the bottom" and that one of the known risks of such an injection is the needle can hit and injure the patient's sciatic nerve if the injection is given incorrectly. Therefore, Ms. Prince testified that nurses giving such injections are "supposed to find their landmarks" to be sure they are giving the injection "in the safe zone" and staying away from the sciatic nerve in "the danger zone." She confirmed that "if you give a shot up here in the safe zone in the proper place, you shouldn't injure the sciatic nerve," and "[i]f you hit the sciatic nerve, you did it wrong[.]" Ms. Prince explained that there are multiple ways to find the necessary landmarks, including the method she used when injecting Plaintiff: "you find the hip bone up here, and maybe give it two or three or six centimeters below the hip bone[.]" She testified that Plaintiff rolled the waistband of her pants down to "right below her hip[,]" that she gave Plaintiff the injection in the exposed area, and that Ms. Prince put a band-aid "over where [she] gave the shot[.]" When asked whether Plaintiff lowered her pants down to her knee, Ms. Prince responded: "Not that I can recall. No, sir."

Edwin Polverino, D.O., a primary care family physician licensed and practicing in Virginia, testified on Plaintiff's behalf as a standard-of-care expert witness. Like Ms. Prince, Dr. Polverino testified that the standard of care requires that dorsogluteal injections be given in the safe zone. He stated that when an injection is given in the safe zone, it is not possible to hit the sciatic nerve, and he opined that Ms. Prince fell below the standard of care by administering Plaintiff's injection in the danger zone and hitting Plaintiff's sciatic nerve. Dr. Polverino testified that his opinion was based on his review of Plaintiff's medical records and "the symptoms that she's had that she's reported, the symptoms that she had and reported to the ER, the symptoms that she had and reported to the Vanderbilt team, to the neurologist that she saw." On cross-examination, Dr. Polverino confirmed that a written report of findings from an MRI performed shortly after the injection indicated "some swelling in [Plaintiff's] gluteus maximus region right where the cortisone injection probably was given, but nothing around the sciatic nerve." However, Dr. Polverino also testified that MRIs are "not diagnostic of sciatic nerve injury" and would not "show this type of injury to the sciatic nerve."

Dennis Michael Lacey, M.D., a neurologist licensed and practicing in Georgia, testified on Plaintiff's behalf as a causation expert witness. Dr. Lacey opined that Plaintiff "sustained significant sciatic nerve injury as a result of the injection" administered by Ms.

Prince. He testified that his opinion was based upon "the symptoms that [Plaintiff] experienced at the time of the injection" and that, in his professional experience, "there's virtually nothing else that will produce that constellation of symptoms other than direct trauma to the [sciatic] nerve itself." Dr. Lacey stated that a February 2020 MRI report showed "post-traumatic findings in the right buttock area, because you could see abnormal signal, which simply means that there is a combination of inflammation and swelling in the right buttock area where you would typically administer some type of intramuscular injection for either antibiotics or steroids or something like that."

Plaintiff's father, Norman Davidson, testified that he was with Plaintiff when she received the injection and later took her to the emergency room. Mr. Davidson testified that Plaintiff was wearing medical scrubs at the time of the injection, and he estimated that she pulled the top of her pants down four to six inches; however, he conceded that he was guessing because he was sitting in front of Plaintiff while she received the injection and was unable to actually see how far she moved her pants or where the injection was given. Nonetheless, Mr. Davidson also testified that later, when Plaintiff was being examined by the emergency room physician, he was able to see the band-aid that had been placed on the injection site by Ms. Prince. He stated that the band-aid was "about directly in the center of [her] right buttocks[.]" Later, Plaintiff's husband, Tony Patterson, testified that he was also present in the emergency room and saw the band-aid that had been placed on the injection site by Ms. Prince. When shown a diagram depicting buttocks, Mr. Patterson indicated that he had also seen the band-aid in the approximate center of Plaintiff's right buttock.

Likewise, Plaintiff testified that she was wearing "stretchy scrubs" when she received the injection, that she "got up and pulled [her] pants down so that [Ms. Prince] had room to work" when giving her the injection, and that she felt the needle pierce "more in the center of [her] butt." On cross-examination, Plaintiff clarified that she pulled her pants down far enough to reveal her "whole butt cheek[.]" She stated that she could not recall having ever received an injection in that location before and that immediately after receiving the injection, she felt "sharp, shooting" pain "in the center of [her] butt" that "kind of radiated up and around and down [her] leg." Plaintiff further explained that the pain "almost felt like it was shooting all the way through from [her] butt to the front of [her] pelvis area."

Erica Hogeland, MSN, CRNP, a nurse practitioner licensed and practicing in Alabama, testified on Hospital's behalf as a standard-of-care expert witness. In laying a foundation for her expert testimony, Ms. Hogeland testified that she is a nurse practitioner currently licensed to practice nursing in Alabama, was licensed to practice nursing in Alabama during the year preceding Plaintiff's injury, and lives in Tuscumbia, Alabama. When asked how she is "familiar with the nursing standard of care for the administration of shots in Shelbyville, Tennessee[,]" she testified, "[t]he population in Shelbyville is pretty

similar to the area where I live in North Alabama. They call it the Tri Cities, and so it's actually three cities, but they're in very close proximity. And so the population is very much the same." Plaintiff's counsel objected and argued that Ms. Hogeland had not satisfied the locality rule for testifying experts in health care liability actions; the trial court sustained the objection. The following exchange then occurred:

> [DEFENSE COUNSEL]: Let me ask you about the medical facilities . . . in the area. What are -- what is the closest medical facility in your area?
> A. The hospital that I work in is North Alabama Medical Center in Florence.
> Q. And how many beds are there; do you know?
> A. 200 -- I'm going to say, probably about 220 to 240.
> Q. And is that similar to Shelbyville, Tennessee?
> A. From what I understand, yes.
> Q. And how did you obtain that information?
> A. Google.

Plaintiff's counsel renewed his objection, arguing that Ms. Hogeland "hasn't said anything about Shelbyville, about the medical community in Shelbyville. She -- she can't just say it's similar to my community. She's got to have facts about Shelbyville that she knows, and she hasn't provided any facts." The trial court ultimately allowed her to testify as an expert in nursing medicine and the administration of shots but noted that it was "a close call[.]" Like the other experts, Ms. Hogeland agreed that dorsogluteal injections must be given "up here in the safe zone away from the sciatic nerve" and that "injections administered outside of [the] upper outer quadrant [of the buttocks] are a major cause of sciatic nerve injection injuries[.]" She ultimately opined that Ms. Prince met this standard of care when injecting Plaintiff and explained that her opinion was based upon the medical record created by Ms. Prince at the time of the injection and Ms. Prince's testimony regarding the manner in which she administered the injection. Ms. Hogeland conceded that if the injection were given in the center of Plaintiff's buttock, "that would be below the standard of care" and that if Ms. Prince gave the injection in the safe zone, "she shouldn't come in contact with or injure the sciatic nerve[.]"

Dr. Carney testified on Hospital's behalf as a causation expert witness. In laying a foundation for his expert testimony, Dr. Carney testified that he is a board-certified neurologist and is board-certified in neurodiagnostics. Dr. Carney was admitted as an expert in neurology and testified within a reasonable degree of medical certainty that the injection at issue did not "hit [Plaintiff's] sciatic nerve." To support this opinion, he showed the jury an image of Plaintiff's right dorsogluteal muscle produced during the MRI study performed on February 25, 2020. However, before he could begin testifying about this image, Plaintiff's counsel objected and challenged Dr. Carney's qualifications to interpret such an image. The trial court overruled the objection, and Dr. Carney proceeded to use the MRI image to show the jury various anatomical landmarks, including the location

of the sciatic nerve. Plaintiff's attorney interrupted this testimony, and the following bench conference occurred:

[PLAINTIFF'S COUNSEL]: All right. So this is Dr. Carney's deposition, you know, that we took, and we went through all of his opinions. And I asked him what he reviewed, and he said, as far as EMGs and the MRIs, you looked at the reports, correct? You did not go back and look at the images? I'm not a radiologist.

And so these are all new opinions that he's -- I asked him what he reviewed, what he went through. And he said he didn't go and look at these images, he didn't look at them. He looked at the reports because he's not a radiologist. So I object to all of this.

[DEFENSE COUNSEL]: Okay. It's -- however, they conduct their discovery deposition, is not up to -- it's not up to us to go in and say I'm sorry, did you mean this or did you mean that?

[PLAINTIFF'S COUNSEL]: No. Discovery depositions are for us to be able to get a fair opportunity to talk to them about their opinions, the basis for their opinions, and then figure out what they're going to say so we can prepare for trial and not get sandbagged, which is what is happening right now.

[DEFENSE COUNSEL]: How is an MRI that's been available to everyone in this case being sandbagged?

[PLAINTIFF'S COUNSEL]: Because I asked him if he looked at it in his deposition so I could know what he was going to say. And if he had told me he looked at it, I may have done something different.

I may have hired a radiologist. I may have had somebody else and go look at the images. I didn't do that because he told me he didn't look at the images. All he did was look at the reports. That's complete sandbagging.

[DEFENSE COUNSEL]: We disclosed that all this was turned over. Period. All of this was turned over.

* * *

[PLAINTIFF'S COUNSEL]: If he was going to do this, I should have been given fair notice of it and he should have told me in his deposition, and he didn't.

[DEFENSE COUNSEL]: He should have told you that at trial he was going to read an MRI?

[PLAINTIFF'S COUNSEL]: Yeah, I'm entitled to know what his opinions and the bases for his opinion so I can prepare for trial. Exactly. That's what a deposition is for.

[DEFENSE COUNSEL]: It helps the jury understand, Judge. It does.

THE COURT: A lot of undisclosed opinions would help the jury understand, but they need to be disclosed.

[DEFENSE COUNSEL]: His disclosed opinion is that the shot did not affect -- the needle did not hit the sciatic nerve. Period. That's not a changed opinion.

[PLAINTIFF'S COUNSEL]: But it's -- what's fundamentally unfair is for me to take his deposition -- because that's what the depositions are for, to say what are your opinions, and what are the bases for your opinions. And he says, I didn't look at the images. I'm not looking at the images.

THE COURT: -- something to read?

[DEFENSE COUNSEL]: Okay. Yeah.

THE COURT: I'm reading -- I'm reading you reading his disclosure, and it says that he reviewed the MRI. I think you could cross-examine him as to the veracity of now why he told you he didn't review it here. But I -- I mean, it was disclosed that he reviewed it.

Following this exchange, Dr. Carney continued interpreting the MRI image for the jury and identified a spot, which he identified as "an infiltrative lesion . . . probably from a needle" and testified "for me, it's unequivocal. That's where the shot was." He also offered alternate explanations for the cause of Plaintiff's injury, including that Plaintiff may have had an allergic reaction to the steroid injected by Ms. Prince. Plaintiff's counsel then requested another bench conference, during which the following exchange occurred:

[PLAINTIFF'S COUNSEL]: . . . I did pull up his disclosure that I had him sign. And it says that he reviewed the MRI report, not the imaging, the report, which is what he testified to. . . .

* * *

THE COURT: Mr. Roskind, if you guys went through, he just got up there and explained how that dot on the MRI --

[DEFENSE COUNSEL]: Yes.

THE COURT: -- was evidence. The -- the injection site of the dot is white because it's inflamed because of inflammation due to a steroid shot.

[DEFENSE COUNSEL]: Yes.

THE COURT: And he did not disclose that opinion, and he just gave that opinion, correct?

[DEFENSE COUNSEL]: Well, no, he is a causation expert. His opinion is the needle had nothing to do with hitting the sciatic nerve. And we have an image that, one, verifies that. And then he's going to testify regarding all these other tests that were done and why they were done. . . .

* * *

[PLAINTIFF'S COUNSEL]: . . . I got a problem, too about the report -- the MRIs. I mean, in his deposition, we had -- and again, the disclosure. This is the one that I had him sign.

And it says, the MRI report, not imaging report. He told me in his deposition I'm not a radiologist. I didn't look at the images.

And then he gets up here and he went through all those images. I want all that stricken, too, as -- frankly, move to strike all that as well as an undisclosed opinion. . . .

[DEFENSE COUNSEL]: . . . We can rely on the records. We can rely on [Plaintiff's treating radiologist] saying that this appears to be a reaction to it. But again, his causation testimony is, the nerve didn't do it, and he's going to testify as to --

THE COURT: And we know this because of this dot. Basically that's what he's getting at, right?

[DEFENSE COUNSEL]: That plus the reports of -- . . . the radiologist who actually read that, right? And so he says, here's the muscle that's in. So we're going to show an anatomy photo to say, here's where the muscle is. Compare that to where this Band-Aid is on this thing.

[PLAINTIFF'S COUNSEL]: That all would have been fair. But this -- all this stuff about going through the imaging is not fair. Because, frankly, if he had done it or told me that it -- it had been at a disclosure or he had told me about it, I would have sent the imaging to Dr. Lacey and had Dr. Lacey go through it.

I didn't get a chance to do that because he never disclosed this. And this allergic reaction is way out of bounds, way out of bounds.

THE COURT: I'll instruct the jury that doctors, pretrial, are required to disclose their opinions and the basis for their opinions. He did not disclose any opinion about an allergic reaction. So please disregard any testimony from this doctor about an allergic reaction. Is that acceptable?

[PLAINTIFF'S COUNSEL]: Acceptable.

The trial court did not make any further rulings about Dr. Carney's interpretation of the MRI image. Following this colloquy, defense counsel quickly moved on from questioning Dr. Carney about the MRI image. However, later in his testimony, he opined that Plaintiff's providers tested for other conditions that could have caused Plaintiff's symptoms because "they looked at the same MRIs we just did and they concluded that . . . this injection was far removed from the sciatic nerve[.]" Furthermore, when discussing an MRI report from a study performed a year later, in February 2021, he testified, "[t]hat hyperintensity, that is that bright spot seen previously, which I showed you, had resolved in the interim." He additionally opined as follows: "It did not hit the sciatic nerve. It's impossible, based on what I heard, what was documented, and . . . what's unique here is you have a radiological image. You don't commonly have that within a week. I mean, . . . this is so straightforward to me." Lastly, during closing arguments, defense counsel stated that "there was no evidence of a needle hitting the nerve, just the opposite. The evidence

- 9 -

is the needle not hitting the nerve. The MRI shows that." When reviewing the verdict form with the jury, defense counsel further argued as follows:

> . . . Do you find [by a] preponderance of the evidence that Licensed Practical Nurse Danielle Prince acted with less than or failed to act with ordinary, reasonable care?
>
> She hit the right location. It's proven on the MRI that that hyperintensity that Dr. Carney saw was seen by Dr. Block. It -- it's an easy one.

Ultimately, the jury returned a verdict in favor of Hospital, finding that Ms. Prince acted within the standard of care when she injected Plaintiff. Plaintiff timely filed a motion for a new trial, arguing that the trial court erred in permitting Dr. Carney to interpret the MRI image from the stand, that the trial court erred in allowing Ms. Hogeland to testify as an expert witness, and that the jury verdict was against the manifest weight of the evidence. The trial court denied the motion, holding in relevant part as follows:

> . . . Defendant's Third Set of Rule 26 Supplemental Disclosures, served on Plaintiff on July 16, 2024, states, "Dr. Carney is expected to provide testimony regarding the cause of Plaintiff's alleged injury and related symptoms . . . and interpretation of the EMG and MRI studies performed by Plaintiff's treating physicians." Further, it appears Defendant supplemented its response to Plaintiff's Interrogatory regarding expert witnesses on July 16, 2024, and referred to its supplemental expert disclosures served the same date in its supplemental response as to the subject matter, substance and facts and opinion upon which each expert would testify.
>
> Defendant disclosed a month before trial that Dr. Carney would offer testimony regarding his interpretation of the MRI and EMG studies at issue in this matter. Therefore, Plaintiff received notice that Dr. Carney would interpret the MRI images, and Plaintiff did not move to exclude within the appropriate time frame prior to trial. Further, Dr. Carney did not testify in his deposition that he had expressly not interpreted or read the subject MRI studies at any time before trial, and Plaintiff had the opportunity to depose Dr. Carney regarding his qualifications to interpret any imaging studies. Finally, Dr. Carney's opinions had already been deduced from the evidence and had already been provided to the jury through medical records from Plaintiff's treating physicians, which were in evidence at the time Dr. Carney testified.
>
> . . . In response to Plaintiff's second argument, the Court finds that Nurse Hogeland met the requirements of Tenn. Code Ann. 29-26-115. The Court further finds that Nurse Hogeland's testimony held no prejudice for Plaintiff and did not affect the ultimate verdict by the jury.

* * *

Even if Nurse Hogeland did not meet the locality rule as argued by Plaintiff, this Court also finds that her testimony held no prejudice to Plaintiff and only reinforced the opinions of Plaintiff's own experts as to the established standard of care. As Defendant stated at the hearing on Plaintiff's motion for a new trial, there was no dispute between the parties or the parties' experts at trial on the applicable standard of care. Throughout trial, the jury universally heard one set of theme or testimony from both parties that if you administer the injection above the line, or in the "safe zone", it is not a breach of the standard of care. If the injection is administered below the line, the standard of care is breached. The evidentiary issue for the jury to decide at trial was whether the subject injection was administered above or below the line described by all experts. The jury ultimately agreed with Defendant that Nurse Prince administered the injection above the line and therefore did not breach the standard of care. Nurse Hogeland's testimony as to the standard of care was not at all inconsistent with the testimony as to the standard of care established by Plaintiff, as she agreed with Plaintiff's experts on the standard of care. Therefore, her testimony did not alter the verdict and was not prejudicial to Plaintiff.

Plaintiff timely appealed to this Court.

## ISSUES

Plaintiff raises two issues on appeal, which we restate slightly:

1. Whether the trial court erred in allowing Dr. Carney to testify to opinions and facts not disclosed in discovery.

2. Whether the trial court erred in allowing Ms. Hogeland to testify that Ms. Prince met the standard of care without first meeting the similar locality rule.

## STANDARD OF REVIEW

"A trial court's decision to accept or disqualify an expert medical witness is reviewed under the abuse of discretion standard[,]" *Shipley v. Williams*, 350 S.W.3d 527, 552 (Tenn. 2011), as is the decision to exclude an expert witness's testimony under Tennessee Rule of Civil Procedure 37.03. *Stanfield v. Neblett*, 339 S.W.3d 22, 30 (Tenn. Ct. App. 2010) (citing *Watkins v. Affiliated Internists, P.C.*, No. M2008-01205-COA-R3-CV, 2009 WL 5173716, at *20 (Tenn. Ct. App. Dec. 29, 2009)). "A trial court abuses its discretion when it causes an injustice by applying an incorrect legal standard, reaching an illogical decision, or by resolving the case 'on a clearly erroneous assessment of the

evidence.'" *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). "The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court." *Id.* (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). "Indeed, when reviewing a discretionary decision by the trial court, the 'appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision.'" *Id.* (quoting *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999)). On the other hand, interpretation of our state statutes and rules of civil procedure "entails a question of law, which we review de novo upon the record with no presumption of correctness for the determination of the courts below." *Flade v. City of Shelbyville*, 699 S.W.3d 272, 281 (Tenn. 2024) (citing *Falls v. Goins*, 673 S.W.3d 173, 179 (Tenn. 2023); *State v. Allison*, 618 S.W.3d 24, 45 (Tenn. 2021); *Fair v. Cochran*, 418 S.W.3d 542, 544 (Tenn. 2013)).

## DISCUSSION

*a.*

Plaintiff argues that the trial court erred by allowing Dr. Carney to testify about his interpretation of the February 2020 MRI image when Hospital had disclosed that Dr. Carney's opinion was based, in part, on the MRI report, but not the image itself.

Rule 26.02 of the Tennessee Rules of Civil Procedure entitles parties to discover "each person whom the other party expects to call as an expert witness at trial, . . . the subject matter on which the expert is expected to testify, . . . the substance of the facts and opinions to which the expert is expected to testify[,] and a summary of the grounds for each opinion." Tenn. R. Civ. P. 26.02(4)(A)(i). A party that has disclosed an expert witness then has a duty to "seasonably" supplement their expert witness disclosure with respect to "the subject matter on which the person is expected to testify[] and the substance of that testimony." Tenn. R. Civ. P. 26.05(1). For example, Rule 26.05(2) expressly requires a disclosing party to seasonably

> amend a prior response if the party obtains information upon the basis of which the party (A) knows that the response was incorrect when made, or (B) knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

"A party who without substantial justification fails to supplement or amend responses to discovery requests as required by Rule 26.05 is not permitted, unless such failure is harmless, to use as evidence at trial . . . any witness or information not so disclosed." Tenn. R. Civ. P. 37.03(1). However, exclusion pursuant to Rule 37.03 "is proper only if the

- 12 -

disclosures failed to give the opposing side reasonable notice of the opinions such that, without exclusion, there would be unfair surprise or trial by ambush." *Stanfield*, 339 S.W.3d at 30 (citing *Watkins*, 2009 WL 5173716, at *20).

The primary fact at issue in this case is whether Ms. Prince administered Plaintiff's injection in the safe zone or in the danger zone. Hospital's initial Rule 26 disclosure made in June 2023 simply stated that Dr. Carney had reviewed Plaintiff's medical records in forming his opinion that the injection was administered in the safe zone but made no reference to the specific diagnostic studies reviewed by Dr. Carney. Thereafter, in October 2023, Hospital supplemented its disclosure and clarified that Dr. Carney had reviewed "the MRI report of February 25, 2020, and the EMG studies performed" throughout 2020 and 2021. When specifically asked at his discovery deposition in November 2023 whether he had reviewed the MRI image or just the report, his answer that he "is not a radiologist" was non-responsive; however, a reasonable person could interpret his answer to mean that he had not reviewed the MRI image. Finally, in July 2024, just over a month before trial, Hospital supplemented its disclosure to state that Dr. Carney was "expected to provide testimony regarding . . . interpretation of the EMG and MRI studies performed by Plaintiff's treating physicians." Nowhere in these disclosures did Hospital clearly disclose that Dr. Carney had reviewed the February 2020 MRI image. Despite this, at trial, Dr. Carney showed the jury the February 2020 MRI image and opined that it was "unequivocal" that a spot on the image was "where the shot was" given.

Our discovery rules are "designed for the discovery of facts which will enable litigants to prepare for trial free from the element of surprise, which, prior to the adoption of the rules, frequently led to a result based more upon the legal maneuvering of counsel than upon the merits of the case." *Strickland v. Strickland*, 618 S.W.2d 496, 501 (Tenn. Ct. App. 1981) (citation omitted). Hospital argues that Dr. Carney's trial testimony "did not contradict his deposition, but simply expanded upon the materials he reviewed, all of which were disclosed" and that it cannot be held responsible for Plaintiff's "failure to appreciate the expanded scope of Dr. Carney's testimony and opinions noted in" the July 2024 supplemental disclosure. However, Hospital's vague change in wording and failure to make clear that the grounds for Dr. Carney's opinion had changed is the exact type of hide-the-ball legal maneuvering that our discovery rules are designed to inhibit. Hospital never disclosed that Dr. Carney would opine that the February 2020 MRI image "unequivocal[ly]" shows where the injection was administered. Accordingly, the trial court abused its discretion in finding that Dr. Carney's testimony regarding the February 2020 MRI image was "proper and previously reasonably disclosed to Plaintiff."

Given this, we must determine whether this error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *see* Tenn. R. Civ. P. 37.03(1) (excluding evidence not disclosed as required by Rule 26.05 "unless such failure is harmless"). Hospital argues that "Dr. Carney's testimony merely

- 13 -

recounted to the jury statements in medical records already admitted without objection" and specifically points to Dr. Polverino's acknowledgment that the February 2020 MRI indicates "some swelling in [Plaintiff's] gluteus maximus region right where the cortisone injection probably was given, but nothing around the sciatic nerve." Hospital also relies upon Dr. Lacey's testimony that the February 2020 MRI

> provided confirmatory evidence that there [] were post-traumatic findings in the right buttock area, because you could see abnormal signal, which simply means that there is a combination of inflammation and swelling in the right buttock area where you would typically administer some type of intramuscular injection for either antibiotics or steroids or something like that.

Notably, however, both Dr. Polverino and Dr. Lacey were testifying about the contents of the February 2020 MRI report. Dr. Carney was the only witness that actually showed the MRI image to the jury and purported to identify the specific location on Plaintiff's buttock where the injection was administered. Hospital recognizes this is a meaningful distinction: ". . . Dr. Carney's identification of the functional anatomy provided critical context for the jury to assess the relationship between the injection site and the sciatic nerve as it directly related to Dr. Carney's [purportedly] disclosed causation opinions." We agree. Again, the disputed factual question in this case is whether the shot was given in the safe zone or in the danger zone. Dr. Carney is the only witness who claimed to be able to "unequivocal[ly]" show the jury where the shot was given. We conclude that this previously undisclosed opinion more probably than not affected the judgment. Accordingly, it should have been excluded. The trial court erred in allowing this testimony and in denying Plaintiff's motion for a new trial on this basis. Therefore, we vacate the jury's verdict and the trial court's judgment and remand this matter for a new trial.

*b.*

Plaintiff also argues that Ms. Hogeland did not satisfy the locality rule set forth in Tennessee Code Annotated section 29-26-115 and that the trial court thus erred by allowing her to testify as a standard-of-care expert witness. Section 29-26-115 provides, in relevant part, as follows:

> (a) In a health care liability action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

> > (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a

similar community at the time the alleged injury or wrongful action occurred;

\* \* \*

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. . . .

Tenn. Code Ann. § 29-26-115(a)(1), (b). "The burden of demonstrating that the expert is qualified is on the party proffering the testimony." *Stanfield*, 339 S.W.3d at 32 (citing *Carpenter v. Klepper,* 205 S.W.3d 474, 483 (Tenn. Ct. App. 2006)). It is undisputed that Ms. Hogeland satisfies the requirements of subsection (b), as she was licensed to practice nursing in Alabama and had practiced nursing in Alabama during the year preceding Plaintiff's injury. However, Plaintiff argues that Ms. Hogeland did not satisfy the requirements of subsection (a)(1) because she did not sufficiently show that the community in which she practices was a similar community to Shelbyville at the time of Plaintiff's injury.

Notably, section 29-26-115(a)(1) "does not require a particular means or manner of proving what constitutes a 'similar community,' nor does it define that term." *Shipley*, 350 S.W.3d at 552. However, our High Court has enumerated

three methods by which a medical expert may demonstrate that he or she has a modicum of familiarity with a particular community or a similar one. [*Shipley*, 350 S.W.3d at 552]. First, the expert may testify "that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area." *Id.* Second, the expert may testify that he or she "has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented." *Id.* Third, the expert may testify that he or she "has visited the community or hospital where the defendant practices." *Id.* Notably, this requirement does not require a medical expert to have "firsthand" or "direct" knowledge of the medical community and the appropriate standard of care in the community in order to qualify as competent to testify. *Id.*

- 15 -

*Bowen v. Nelson*, No. W2024-00749-COA-R3-CV, 2025 WL 1504456, at *4 (Tenn. Ct. App. May 27, 2025), *perm app. denied* (Tenn. Sept. 10, 2025). Ultimately, medical experts in health care liability actions "may not simply assert their familiarity with the standard of professional care in the defendant's community without indicating the basis for their familiarity." *Stanfield*, 339 S.W.3d at 32 (quoting *Williams v. Baptist Mem'l Hosp.*, 193 S.W.3d 545, 553 (Tenn. 2006)).

In *Bowen*, the standard-of-care and causation expert witness disclosed by a health care liability act plaintiff was deposed and failed to identify any relevant demographic data pertaining to the defendants' community. 2025 WL 1504456, at *6. The proffered expert also stated that he was unaware of the number of medical facilities and services in the community, that he had not discussed the standard of care in the relevant community with a physician from that community or a neighboring community, and that he had not visited either the relevant community or the treating hospital. *Id.* The proffered expert testified that he was "familiar with hospitals similar to" the treating hospital; however, on appeal this Court concluded that "this claim was unsupported by his own testimony and was merely a bare assertion of familiarity." *Id.* at *7. Similarly, in this case, Ms. Hogeland failed to identify any relevant demographic data pertaining to Shelbyville. Although she testified that the population in Shelbyville is "pretty similar" to her northern Alabama community and that the hospital where she works is similar to the hospital in Shelbyville, it is unclear how she could have determined that "when [s]he did not demonstrate that [s]he had a benchmark knowledge for either comparison." *See id.* (citing *Jackson v. Thibault*, No. E2021-00988-COA-R3-CV, 2022 WL 14162828, at *8 (Tenn. Ct. App. Oct. 25, 2022)). Therefore, Hospital did not satisfy its burden to show that Ms. Hogeland satisfied the requirements of section 29-26-115(a)(1), and the trial court abused its discretion in allowing her to testify as an expert witness.

Again, we must determine whether this error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Importantly, the standard of care in this case is undisputed. The parties' respective expert witnesses agree that the standard of care is to give dorsogluteal injections in the "safe zone," and the location of this zone is likewise undisputed. Although Ms. Hogeland further opined that Ms. Prince administered Plaintiff's injection in the "safe zone," Ms. Hogeland's basis for such opinion was simply the fact that Ms. Prince represented that she had done so. Ms. Prince had already testified to the jury that she had administered Plaintiff's injection in the safe zone; thus, Ms. Hogeland's opinion in this regard was merely cumulative to Ms. Prince's testimony. Given this, we cannot conclude that Ms. Hogeland's testimony more probably than not affected the judgment, and this error alone would not be a basis to set aside the trial court's judgment.

## CONCLUSION

For the reasons stated herein, the jury's verdict and the trial court's judgment are vacated, and the case is remanded for a new trial and any other further proceedings consistent with this Opinion. Costs on appeal are assessed one-half to the appellant, Riley Davidson, and one-half to the appellee, Shelbyville Hospital Company, LLC.

_____
KRISTI M. DAVIS, JUDGE