IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 1, 2025 Session

## KRISTYN ELISE TURNER, DECEASED, BY AND THROUGH HER NATURAL PARENTS, ANNA MARIE TURNER ET AL. v. CHARLES BRENT BOLES, M.D.

**Appeal from the Circuit Court for Rutherford County**
No. 74272    Bonita Jo Atwood, Judge

_____

**No. M2024-00382-COA-R3-CV**

_____

Parents, on behalf of their deceased child, filed a health care liability action against an obstetrician, alleging that the infant's death was the result of negligent medical treatment during delivery. The jury returned a verdict in favor of the defendant. On appeal, the parents argue that the trial court erred in: (1) limiting the testimony of their causation expert and excluding his exhibits and demonstrative aids; (2) denying a motion in limine to prohibit a line of questioning and argument by the defense; (3) excluding evidence of the suspension of the defendant's medical license; (4) refusing a request for a special jury instruction on informed consent; and (5) declining to grant a new trial based on misconduct of defense counsel during closing argument. Discerning no reversible error, we affirm the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN. W. MCCLARTY, P.J., E.S., and JEFFREY USMAN, J., joined.

Joe Bednarz, Sr. and Joe, Bednarz, Jr., Hendersonville, Tennessee, for the appellants, Anna Marie Turner, Nichalus Turner, and Estate of Kristyn Elise Turner.

Dixie Cooper and James D. Sperring, Brentwood, Tennessee, for the appellee, Charles Brent Boles.

**OPINION**

**I.**

A.

Kristyn Elise Turner was born on December 6, 2016; she died just four days later. Anna and Nichalus Turner, on behalf of their deceased child, filed this health care liability action against Dr. Charles Brent Boles. The Turners alleged that Dr. Boles, Mrs. Turner's obstetrician, provided negligent medical care during Mrs. Turner's labor and delivery, which caused or contributed to Kristyn's death.

Due to complications that developed during pregnancy, Mrs. Turner was admitted to St. Thomas Rutherford Hospital for induction of labor on December 5, 2016. For the most part, her labor progressed normally until early evening the next day. At 6 p.m., the labor and delivery nurse documented variable recurrent decelerations in the baby's heart rate, which indicated that the baby might not be receiving enough oxygen. Following nursing protocols, the nursing staff took steps to remedy the situation and notified Dr. Boles.

Upon his arrival, Dr. Boles saw some improvement in the fetal heart rate. But when he examined Mrs. Turner, he discovered that the baby had entered the birth canal in the occiput posterior position rather than the preferred position for a vaginal delivery—occiput anterior. In other words, she was face up instead of face down, making it harder for her head to pass through the birth canal. The physician also noted a failure to progress. During his assessment, the baby's head did not move forward with the mother's contractions. He told the parents he would try a manual rotation to facilitate the delivery. But despite his best efforts, he was unable to turn the baby to the preferred position. Concerned about the baby's well-being, Dr. Boles decided that a cesarean section was now the best option for a successful outcome.

With the mother's consent, Dr. Boles performed a cesarean section. Even this delivery method proved difficult. The baby's head was deeply wedged in her mother's pelvis. With a nurse's help, Dr. Boles dislodged it and delivered Mrs. Turner's first child. Due to the difficult extraction, Dr. Boles asked the neonatal intensive care team to assess the infant at birth. A subsequent scan of the infant's head showed multiple left-sided skull fractures with associated hemorrhages. Kristyn was transferred to Vanderbilt University Medical Center for treatment, where she died from traumatic brain injuries. The autopsy report identified the underlying cause of death as birth trauma.

B.

After several pre-trial skirmishes, both sides presented their evidence to the jury in a hotly contested battle of medical experts. Dr. Bruce Bryan, a board-certified obstetrician, and Dr. Matthew Thompson, a board-certified pediatric pathologist, testified on behalf of the Turners. Dr. Boles countered with his own experts: Dr. Thomas Stovall, a board-

2

certified obstetrician, and Dr. James Eastwood, a board-certified neuroradiologist. The jury also heard from multiple fact witnesses, including the Turners and Dr. Boles.

In Dr. Bryan's expert medical opinion, Dr. Boles deviated from the standard of care when he attempted to manually rotate the baby's head. According to Dr. Bryan, a manual rotation was not medically necessary at that juncture. When Dr. Boles arrived at the bedside, in Dr. Bryan's opinion, the baby's health was not at risk. Dr. Bryan agreed that the fetal heart rate tracing was not reassuring. Still, it improved after the nursing interventions and, presumably, would continue to improve. And, he stressed, the mother had only been pushing for about twenty minutes, not long enough to diagnose a true failure to progress. Dr. Bryan insisted that given a little more time, "the baby would have been born naturally" without the need for physician intervention. Still, he acknowledged that vaginal delivery in the occiput posterior position increased the risk of fetal trauma.

Dr. Bryan further opined that Dr. Boles used excessive force during the attempted rotation, thus fracturing the infant's skull. As he explained, "you have to use gentle pressure." Given the presence of multiple left-sided fractures, Dr. Bryan believed that Dr. Boles exceeded the mark. Dr. Bryan conceded that he had no personal experience with a manual rotation causing a skull fracture. Nor was he able to find any medical literature to support his causation opinion. But, in his view, "statistics here aren't what's important." He believed that there was "ample evidence that this could have occurred, despite the fact that [he] could not find it written up in the literature."

Dr. Thompson opined that the autopsy findings were consistent with Dr. Bryan's causation opinion. As he explained, the location of the fractures noted in the autopsy report was consistent with the placement of a hand during a manual rotation. And, in his opinion, it appeared that a great amount of pressure had been applied to the infant's left lateral skull, causing her death. He did not believe that these injuries could have been caused by cephalopelvic disproportion, meaning a mismatch between the baby's presentation and the mother's pelvic structure. In those cases, he typically saw fractures in the front of the skull, in the occipital bone. When asked about the facture in the occipital bone noted in the autopsy report, he surmised that the notation was merely a typographical error.

Like Dr. Bryan, however, Dr. Thompson was forced to acknowledge that he had never seen or heard of a skull fracture caused by a manual rotation. But he knew that skull fractures had occurred from the use of forceps during delivery. As he told the jury, he saw no real difference between a hand and a set of metal forceps. In his view, "whether they be hands or whether they be tongs, they can still apply the same type of pressure and force to the baby's head."

The defense presented evidence that the trauma to the baby's skull was not limited to the left side. Dr. Eastwood, a neuroradiologist, reviewed the films and scans of the

infant's head taken at both hospitals. He found evidence of fractures to the left, right, front, and back of the skull—a total of five fractures in four separate bones.

For his part, Dr. Boles insisted that he had provided appropriate medical treatment during labor and delivery. He had delivered over 9,000 babies in his career. Thus, he was well-versed in the proper technique for a manual rotation and when such a maneuver was medically indicated. Dr. Boles did not remember the exact time he arrived at the bedside. But whatever time he arrived, he explained, he was confronted with an urgent situation. The baby was in the birth canal in the occiput posterior position and, in his assessment, not moving forward. Given the prolonged variations in the fetal heart rate, he had concerns about the baby's well-being. The latest heart rate tracing showed improvement, but it was still not reassuring. So he tried to turn the baby to expedite the delivery. In his opinion, he could not afford to wait and see how labor progressed over the next hour, as Dr. Bryan had suggested. It was time to intervene. As it turned out, he noted, a critical lab value supported his decision. The cord blood gas showed mild respiratory acidosis, which confirmed his suspicion that the baby was not getting enough oxygen.

In Dr. Boles's estimation, he had performed around a thousand manual rotations without incident. He always used his hand for the maneuver, not forceps. With a hand, he explained, "you can tell how much force you're applying and you know not to continue going further." Like Dr. Bryan, he was unaware of any reports in medical literature linking skull fractures at birth with a manual rotation during delivery. He believed the far more likely cause of Kristyn's injuries was birth trauma from the natural forces of labor pushing the baby's head against the mother's pelvis or the unavoidable force used to dislodge the baby from the birth canal during the cesarean section.

Dr. Stovall agreed with Dr. Boles's assessment. He acknowledged Dr. Bryan's statement that many "occiput posterior" babies will turn spontaneously without any intervention. Still, Dr. Stovall explained, four to five percent of babies are what doctors call, "persistent occiput posterior." These babies enter the birth canal in the posterior position. Because of the space constraints, he continued, babies typically do not rotate by themselves inside the birth canal. Thus, a manual rotation would be a normal intervention. In Dr. Stovall's opinion, based on the non-reassuring fetal heart rate tracing, it was "time to sort of move the process along and get the baby delivered." He reminded the jury that manual rotation significantly increases the likelihood of a successful delivery in these situations. While Dr. Stovall recognized that a skull fracture during a manual rotation was theoretically possible, he did not view it as a "real" possibility. As far as he knew, it was a risk-free maneuver. According to Dr. Stovall, "there's never been a reported case of having an injury of any type with a manual rotation." In his opinion, it was much more likely that the baby's injuries were caused by other forces, such as cephalopelvic disproportion or the difficult extraction from the pelvis during the cesarean section.

4

At the conclusion of the proof, the attorneys made their closing arguments. The trial court charged the jury, and after deliberations, the jury returned a verdict in favor of Dr. Boles. Unable to find by a preponderance of the evidence that Dr. Boles deviated from the standard of care, the jury did not address causation. The trial court entered a judgment in accordance with the jury verdict and subsequently denied the Turners' motion for new trial.

## II.

The Turners raise multiple issues on appeal. They contend that the trial court erred by limiting Dr. Thompson's testimony and excluding his exhibits and demonstrative aids before trial. They challenge the trial court's decision to deny a motion in limine seeking to prohibit an irrelevant, or unduly prejudicial, line of questioning and argument by the defense. They also argue that the trial court erroneously excluded relevant evidence of the suspension of Dr. Boles's medical license and denied their request for a special jury instruction on informed consent.[1] Finally, they insist that they are entitled to a new trial based on the blatant misconduct of defense counsel during closing argument.

### A.

The Turners' first issue focuses on two pre-trial rulings that they claim prevented Dr. Thompson from "completely and adequately" explaining his opinions to the jury. As a discovery sanction, the court precluded Dr. Thompson from "testifying to any opinions other than those contained in his Rule 26 disclosure." *See* TENN. R. CIV. P. 26.05(1), 37.03(1). It also excluded many of his proposed trial exhibits and demonstrative aids as either irrelevant or unfairly prejudicial. *See* TENN. R. EVID. 401-03. During trial, their argument continues, the court compounded these errors by sustaining "unwarranted" objections to Dr. Thompson's testimony and instructing the jury to disregard some of his statements.

In a similar vein, the Turners contend that the court erroneously denied their motion in limine seeking to preclude "any argument, testimony, or questions" at trial about the absence of medical literature linking skull fractures in infants to manual rotations during delivery. They contend that the <u>absence</u> of literature was, at best, irrelevant and, at worst, unfairly prejudicial. *See* TENN. R. EVID. 401-03, 618.

---

[1] We can quickly dispose of the special jury instruction issue. The trial court has a duty to instruct the jury on every factual issue and theory for recovery raised by the pleadings and supported by the evidence. *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 372 (Tenn. 2006). If a special instruction correctly states the law, is supported by the evidence, and is not contained elsewhere in the jury charge, the court should grant the request. *Id.* Here, although the complaint included an informed consent claim, informed consent was not a theory of recovery at trial. The Turners' counsel admitted as much at oral argument. So the court did not err in refusing this request.

5

We need not address the merits of these first two issues. Even if the Turners are correct, we cannot grant them the relief they seek. We will only set aside a final judgment based on the erroneous admission or exclusion of evidence when the evidence, if it had been admitted, would have affected the outcome. *See* TENN. R. APP. P. 36(b); *Pankow v. Mitchell*, 737 S.W.2d 293, 298 (Tenn. Ct. App. 1987). Dr. Thompson was offered as a causation expert. And the motion in limine sought to preclude an anticipated challenge to the causation opinions offered by the Turners' experts. But the jury never reached the causation issue. To the extent that the court erred in limiting Dr. Thompson's testimony, excluding his exhibits and demonstrative aids, or in denying the motion in limine, these errors did not affect the judgment. *See* TENN. R. APP. P. 36(b).

B.

According to the Turners, the trial court also erred when it precluded them from questioning Dr. Boles about the suspension of his Tennessee medical license. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015), *as revised on denial of reh'g* (Aug. 26, 2015). A court abuses its discretion when it applies an incorrect legal standard, reaches an unreasonable result, or bases its decision on a clearly erroneous assessment of the evidence. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). In reviewing the trial court's exercise of discretion, we presume that the decision is correct and review the evidence in a light most favorable to upholding the decision. *Lovlace v. Copley*, 418 S.W.3d 1, 16-17 (Tenn. 2013).

The Turners argue that the suspension of Dr. Boles's medical license was relevant to his credibility as a witness. *See Sneed v. Stovall*, 22 S.W.3d 277, 281-82 (Tenn. Ct. App. 1999). During direct examination, Dr. Boles testified that he closed his medical practice in 2020 and moved to Florida with his family. After the move, he "chose not to pay for the renewal [of his Tennessee medical license] at the beginning of 2022, because [he] was not planning to return." On cross-examination, opposing counsel tried to ask Dr. Boles whether the Tennessee Board of Medical Examiners, in fact, suspended his license for unprofessional conduct. But the trial court sustained defense counsel's objection to this line of questioning, finding that the evidence was unduly prejudicial under the circumstances.

Based on this record, we discern no error in this decision. A court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TENN. R. EVID. 403. Like the trial court, we find the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. The record shows that the Tennessee Board suspended Dr. Boles's license in 2023, with his consent, because he violated his duty to ensure his patients had access to their medical records after he closed his medical practice. The disciplinary action involved events that occurred four years after Kristyn's delivery. And

6

the "unprofessional, dishonorable or unethical conduct" involved a record-keeping problem, not patient care. Nor was Dr. Boles's veracity placed squarely at issue. *Cf. Sneed*, 22 S.W.3d at 281-82. He never denied that his license was suspended. And nothing in the consent order directly contradicted his previous testimony. Under these circumstances, the proffered evidence, while probative, had an "undue tendency to suggest decision on an improper basis" and was properly excluded. *State v. DuBose*, 953 S.W.2d 649, 654 (Tenn. 1997).

## C.

Finally, the Turners maintain that they are entitled to a new trial based on defense counsel's misconduct. They claim defense counsel made "inaccurate representations" to the trial court[2] and made statements "they knew to be false or unsupported by the evidence before the jury." Specifically, they point us to what they view as blatant misrepresentations or mischaracterizations in defense counsel's closing argument. The trial court has broad discretion in controlling closing argument, and we review this issue under the abuse of discretion standard. *Stanfield v. Neblett*, 339 S.W.3d 22, 43 (Tenn. Ct. App. 2010). We will not disturb the trial court's refusal to grant a new trial on this basis unless the argument was "clearly unwarranted and made purely for the purpose of appealing to passion, prejudice and sentiment" which was not or could not be cured at trial or we affirmatively find that the improper argument affected the outcome. *J. Avery Bryan, Inc. v. Hubbard*, 225 S.W.2d 282, 287 (Tenn. Ct. App. 1949).

Here, the Turners claim that defense counsel made an improper argument about peer review investigations at hospitals. Counsel should promptly object to misconduct of opposing counsel during closing argument or risk waiver of that issue on appeal. *Lee v. Lee*, 719 S.W.2d 295, 299 (Tenn. Ct. App. 1986). Because the Turners' counsel failed to object to the alleged misstatements about peer review or request a curative instruction, we will not consider a misconduct argument based on those statements. *See McCall v. Bennett*, 243 S.W.3d 570, 573 (Tenn. Ct. App. 2007) (refusing to consider whether appellant was entitled to a new trial based on opposing counsel's misconduct during closing argument because appellant failed to make a timely objection).

The Turners also insist that defense counsel mischaracterized the cause of death in the autopsy report by stating it was cephalopelvic disproportion when it was actually birth trauma. Plaintiff's counsel objected to this remark, but his objection was overruled. "Closing arguments allow counsel to present their theory of the case and to point out strengths and weaknesses in the evidence." *Stanfield*, 339 S.W.3d at 43. When recounting

---

[2] As best we can discern, these "inaccurate representations" happened during the "unwarranted" objections to Dr. Thompson's testimony. Thus, as explained above, even if this alleged misconduct occurred, we cannot grant the Turners any relief on this basis. *See* TENN. R. APP. P. 36(b).

the autopsy findings, counsel accurately told the jury that "primiparity"[3] and cephalopelvic disproportion were the only pertinent risk factors for birth trauma listed in the autopsy report. She maintained that they would find no mention of a manual rotation in the report. According to defense counsel, one conclusion the jury could draw from the autopsy report was that cephalopelvic disproportion was the cause of death, not excessive force during an attempted manual rotation. She also reminded the jurors that they would be able to look at the autopsy report themselves during their deliberations. Viewed in context, we cannot say that counsel's statements about the autopsy report rose to the level of actionable misconduct. *See Lee*, 719 S.W.2d at 299 (recognizing that attorneys have considerable latitude in closing argument to state the inferences and conclusions to be drawn from the evidence).

But even if we found counsel's argument inappropriate, we will not order a new trial based on improper closing argument unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." TENN. R. APP. P. 36(b). We conclude that, in light of the entire record, counsel's statements about the cause of death did not affect the jury's verdict or prejudice the judicial process. During his rebuttal argument, plaintiff's counsel took the opportunity to correct any juror misconceptions, calling defense counsel's characterization of the autopsy report "nonsense." And he reminded the jury that the attorneys' statements were not evidence. Besides, the jury rendered its verdict without reaching the causation question. Thus, the Turners cannot show that any misstatements about the cause of death in the autopsy report affected the outcome.

## III.

We conclude that the Turners are not entitled to a new trial. The trial court appropriately excluded evidence of the suspension of Dr. Boles's medical license and denied the request for a special jury instruction on informed consent. Having considered the entire record, we further conclude that the Turners have not demonstrated that any of the trial court's other alleged errors affected the judgment or prejudiced the judicial process. So we affirm the trial court's judgment in all respects.

s/ W. Neal McBrayer
W. NEAL MCBRAYER, JUDGE

---

[3] "Primiparity" meant that this was Mrs. Turner's first labor.